The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Samuel J. MACK, Defendant-Appellant.

No. 81SA104.

Supreme Court of Colorado, En Banc.

Nov. 30, 1981.

Rehearing Denied Dec. 28, 1981.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Mary E. Ricketson, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Michael Heher, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Samuel Joe Mack (defendant) appeals his conviction based on jury verdicts of guilty to one count of first degree sexual assault, section 18–3–402(1)(b), C.R.S.1973 (1976 Supp.),[1] and two

---

1. Section 18–3–402(1)(b), C.R.S.1973 (1976 Supp.), which was effective on the date of the offense, defined the crime of sexual assault in the first degree as follows:

"(1) Any actor who inflicts sexual penetration on a victim commits a sexual assault in the first degree if:

\* \* \* \* \* \*

"(b) The actor causes submission of the victim by threat of imminent death, serious bodily injury, extreme pain, or kidnapping, to be inflicted on anyone, and the victim believes that the actor has the present ability to execute these threats."

"Sexual penetration" includes, *inter alia*, fellatio. Section 18–3–401(6), C.R.S.1973 (1976 Supp.). Sexual assault in the first degree was a class 2 felony if the actor was armed with a deadly weapon and used the weapon to cause submission of the victim.

counts of felony menacing, section 18–3–206, C.R.S.1973.[2] His claims relate to his competency to proceed to trial and various rulings made by the court during the sanity trial and the trial on the merits.[3] He first asserts that he was denied due process of law by the trial court's refusal to consider a second motion for a competency determination following a prior judicial determination of competency. He also challenges the court's refusal to admit hospital records during the sanity trial and the sufficiency of evidence to support the jury's finding of sanity. With regard to his trial on the merits, the defendant claims that the court erroneously denied his motion to suppress out-of-court and in-court identifications, improperly admitted testimony of his refusal to sign a *Miranda* advisement form, and incorrectly instructed the jury on the culpable mental state for first degree sexual assault. Finding no reversible error, we affirm the judgment of conviction.

### I.

On the afternoon of October 30, 1976, Robert S. and Pamela N. were hitchhiking on interstate highway 25 outside of Pueblo, Colorado. They were offered and accepted a ride by a man who introduced himself as "Sam Mack." They saw the words "Galloping Gourmet" imprinted on the back of his station wagon and, once inside the vehicle, they heard the man identify himself several times on his CB radio as the "Galloping Gourmet." The man drove them to a Sambo's Restaurant where they ate a meal. Upon leaving the restaurant they noticed the vehicle had a flat tire. After the tire was fixed at a service station, the man then told Robert and Pamela that he would take them to a truck stop where they could catch

another ride. He drove them back to the highway, turned off an exit onto a dirt road, and stopped his car in a tunnel-like area that apparently was an underpass to the highway. Pointing a knife at Robert's throat, he threatened to kill him unless Pamela disrobed. When she complied, he held the knife to her throat and ordered Robert to undress. The man told them to lie down on the road and then ordered Pamela to perform oral sex on Robert. Afterwards he beat Robert and forced him to lie down behind the rear wheels of the car. At knifepoint he forced Pamela back into the car. When he started the car, Robert ran back toward the highway and Pamela was pushed out onto the road.

Approximately one hour after the assault, Robert and Pamela were shown a photographic array of three subjects compiled by Detective Fringer and Sergeant Wallingford of the Pueblo County Sheriff's Department. Each photo card displayed two views of the same individual and all written material on the cards was obscured from the victims' view. Sergeant Wallingford, believing the victims' physical descriptions matched the defendant, whom he knew, included the defendant's photograph in the array. The sergeant also was aware that "Galloping Gourmet" was the defendant's CB call name. The victims were shown the photos outside of each other's presence, and were asked if they could identify any of them. All of the photographs were displayed in the same manner. Both Robert and Pamela separately selected the defendant's photograph as that of their assailant.

The defendant was arrested at his Pueblo home that evening. On the following day,

---

Count one of the information charged the defendant with unlawfully and intentionally inflicting sexual penetration on the victim, Pamela N., while armed with a deadly weapon, a knife.

We use initials in place of the victims' last names throughout this opinion.

2. Under section 18–3–206, C.R.S.1973, a person commits the crime of menacing if "by a threat or physical action, he intentionally places or attempts to place another in fear of imminent

serious bodily injury." If menacing is committed by the use of a deadly weapon, it is a class 5 felony.

Counts two and three charged the defendant with menacing Pamela N. and Robert S. with a knife.

3. This appeal was originally filed in the court of appeals but was transferred to this court pursuant to sections 13–4–102(1)(b) and 13–4–110, C.R.S.1973.

October 31, Detective Fringer advised the defendant of his *Miranda*[4] rights. The defendant refused to sign the advisement form or indicate his understanding of the rights described therein. On November 1 the defendant requested to see the detective, was again advised of his rights, signed the advisement form, and made a statement. He admitted that he gave Robert and Pamela a ride to Sambo's Restaurant for a meal and then took them back to the highway north of Pueblo but denied any criminal acts.

On January 13, 1977, the defendant's attorney moved for a determination of competency pursuant to section 16–8–110, C.R.S.1973 (1978 Repl. Vol. 8). The court ordered the defendant to be transferred to the Colorado State Hospital for observation. After receiving a report from the state hospital, the court on January 31 made a preliminary finding of competency and granted the prosecution and defense ten days to request a hearing. The order noted the preliminary determination would become final if no hearing was requested within the ten day period. No request for a hearing was made, and the defendant entered pleas of not guilty by reason of insanity. On March 29 the defendant's attorney withdrew, and on April 29 the defendant's new attorney filed a second motion for determination of competency, alleging a material deterioration in the defendant's mental state since the court's preliminary determination.[5] The court denied the motion, ruling that it was premature in view of the pending insanity plea.[6]

At the sanity trial the prosecutor rested initially on the presumption of sanity. Section 16–8–105(2), C.R.S.1973 (1978 Repl. Vol. 8). The defendant presented testimo-

ny of lay witnesses regarding his bizarre actions in jail while awaiting trial on the pending charges. He also offered into evidence the records of the Colorado State Hospital pertaining to his insanity adjudication in 1970 for forgery. The court sustained the prosecutor's objection to the records on grounds of relevancy. However, the defendant was permitted to elicit testimony from the custodian of the records about the defendant's 1970 commitment and his status as an out-patient at the time of the offenses in issue. Also, the defendant's prior insanity adjudication, commitment and release were fully explored later in the trial during defense counsel's cross-examination of the prosecution's expert witnesses.

After the defendant rested the prosecutor elicited rebuttal testimony from two psychiatrists and a psychologist. Although the prosecution's experts diagnosed the defendant as suffering from a severe antisocial personality disorder, they concluded that he was legally sane under the Colorado definition of insanity. Dr. Anne Courtwright, a psychiatrist, testified that she saw no indication that the defendant was mentally impaired, or that he could not distinguish right from wrong. In her opinion, one who is diagnosed as an antisocial personality, rather than as a psychotic, has chosen to live by a code of ethics different from the socially accepted norm. Such a person, in her opinion, is legally sane because he acts from choice and not from illness.

Another psychiatrist, Dr. Lawrence Austin, noted the defendant had a history of not controlling his behavior outside a structured institution but found no evidence of psychosis. He testified that an individual may display behavior like the defendant's

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The motion for a second competency determination alleged that the defendant had attempted suicide at the county jail and his deteriorating mental condition rendered him incompetent to proceed.

6. The court apparently was referring to the provisions of section 16–8–110, C.R.S.1973 (1978 Repl. Vol. 8), which provides that except for an insanity trial, no person shall be tried if he is incompetent to proceed. The defendant questions the constitutionality of this statutory exception but we decline to address it in this case. *See* note 10, *infra*.

throughout a lifetime and never be insane within the statutory definition of insanity.[7]

Dr. Allen Simmons, a clinical psychologist, also tested and interviewed the defendant. He found no evidence of an inability to distinguish right from wrong or to refrain from doing the wrong. In his opinion a person who could not distinguish right from wrong would have been institutionalized as unable to function at all. Although the defendant had a history of poor self-control, the doctor concluded that he did have the ability to control his actions and was legally sane.

The jury found the defendant sane. Neither the defense nor the prosecution raised again the issue of the defendant's competency to proceed.

Prior to trial on the merits the defendant moved to suppress his November 1 statement to Detective Fringer as well as the pretrial photographic identification by Robert and Pamela. At the outset of the suppression hearing he withdrew the motion to suppress his statement.[8] During the suppression hearing on the photographic identifications Detective Fringer described the circumstances surrounding the compilation of the photographic array and further described the effort made to include in the array subjects with similar physical and facial characteristics, including hair color, facial hair and age. The court denied the defendant's motion to suppress the photographic identifications.

At the trial on the sexual assault and felony menacing charges, Robert and Pamela each identified the defendant as their assailant. The court admitted evidence of the pre-trial identifications. Detective Fringer testified without objection that the defendant refused to sign the *Miranda* advisement form on October 31. When the prosecutor offered into evidence the form itself the defendant objected and the court sustained the objection. The defendant's custodial statement on November 1 thereafter was received into evidence without objection.

In preparing instructions the trial court specifically asked defense counsel if there were any objections to a specific intent instruction for the crimes of first degree sexual assault and felony menacing. Defense counsel agreed to the proposed instruction on specific intent and the trial court thereafter instructed the jury as follows:

*"Instruction No. 12*

"To constitute a crime there must be the joint operation of an act forbidden by law, and a culpable mental state. A culpable mental state means 'with specific intent' as the term is explained in this instruction.

"Where a crime consists of an act combined with a specific intent, as do Sexual Assault in the First Degree and Menacing by use of a Deadly Weapon, the specific intent is just as much an element of the crime as is the act. The specific intent

7. Dr. Austin testified that equating insanity with psychosis is consistent with accepted psychiatric standards:

"Q: Does psychiatric science recognize that someone is so mentally ill, without a psychosis, that they could be insane?
"A: No, sir. We would not use that word 'insane' in psychiatry. In fact, the word 'insane' is an outmoded term, which would no longer be used. In psychiatry, we now use the word 'psychotic' as an equivalent [to] insanity."

8. These statements were made at the hearing on defendant's motion to suppress:

"MR. REICHMAN: [Prosecutor] There was one statement which was taken from Mr. Mack on November 1, 1976. I've explained

to Mr. Simons the manner in which that occurred, and I believe he would be willing to stipulate to withdrawing the motion as to the suppression motion on the statement...."

\* \* \* \* \* \*

"MR. SIMONS: [Defendant's Counsel] Your Honor, I have no problem with the statement that was given on November 1, 1976....
"THE COURT: [A]re you saying that the Motion to Suppress would be withdrawn as to the statement that was given on November 1, 1976, is what you're saying?
"MR. SIMONS: Yes, Your Honor, as far as we know at this point. What has been told to us, Mr. Mack indicates that's basically what happened on the date that the statement was given."

must be proven beyond a reasonable doubt as a matter of fact, either by direct or circumstantial evidence. The specific intent may be manifested by the circumstances connected with the perpetration of the offense and the sound mind and discretion of the defendant. Proof of the commission of the act alone does not warrant the presumption that the defendant had the specific intent.

"Specific intent is a state of mind voluntarily and willfully to do or perform an act which will effect a certain result. Such an act must not be the result of accident or other innocent reason. The defendant's conscious object must be to cause a certain result."

### "Instruction No. 14

"When the offense instruction prescribes as an element thereof specific intent, such mental state is deemed to apply to every element of the offense unless its application is clearly limited."

The jury returned verdicts of guilty to all counts and the defendant was sentenced to a term of 20–28 years for first degree sexual assault and to concurrent terms of 3–5 years for felony menacing. We consider sequentially the defendant's claim relating to his competency to proceed to trial, his evidentiary claims relating to the sanity trial, the court's denial of his motion to suppress out-of-court and in-court identifications, the admission of his refusal to sign the *Miranda* advisement and lastly his claim relating to the jury instruction No. 12 on specific intent.

### II.

The defendant asserts that the trial court's refusal to grant his motion for a second determination of competency denied him due process of law, *U.S.Const.* Amend. XIV; *Colo.Const.* Art. II, Sec. 25, and his right to effective assistance of counsel, *U.S. Const.* Amend VI; *Colo.Const.* Art. II, Sec. 16. We disagree.

By the terms of section 16–8–102(3), C.R.S.1973 (1978 Repl. Vol. 8), a defendant. is incompetent to proceed when he suffers "from a mental disease or defect which renders him incapable of understanding the nature and course of the proceedings against him or of participating or assisting in his defense or cooperating with his defense counsel." Section 16–8–110, C.R.S. 1973 (1978 Repl. Vol. 8), provides that

"[e]xcept for trial of the issue raised by a plea of not guilty by reason of insanity, no person shall be tried ... if he is incompetent to proceed at that stage of the proceedings against him."

If the judge has reason to believe that the defendant is incompetent, he must suspend the proceedings and determine competency or incompetency. Section 16–8–110(2)(a), C.R.S.1973 (1978 Repl. Vol. 8). The prosecution or defense also may raise the issue of competency by motion. Section 16–8–110(2)(b), C.R.S.1973 (1978 Repl. Vol. 8). The procedures for determining competency, as pertinent here, are outlined in sections 16–8–111(1) and (2), C.R.S.1973 (1978 Repl. Vol. 8):

"(1) Whenever the question of a defendant's incompetency to proceed is raised, the court shall make a preliminary finding either that the defendant is incompetent to proceed or that he is not. If the court feels that the information available to it is inadequate for making such finding, it may order a competency examination or such other investigation as it deems advisable.

\*   \*   \*   \*   \*   \*

"(2) The court shall immediately notify the prosecuting attorney and defense counsel of the preliminary finding. If neither the prosecuting attorney nor defense counsel requests, in writing, a hearing within a time set by the court, the preliminary finding becomes a final determination. Upon the timely request of either the prosecuting attorney or defense counsel, the court shall hold a hearing and may commit the defendant for a competency examination prior to the hearing if adequate psychiatric information is not already available. At the conclusion of the hearing, the court shall

make a final determination. Upon the request of either party, the judge shall set the matter for hearing before another judge. At any hearing pursuant to this subsection (2), the burden of submitting evidence and the burden of proof by a preponderance of the evidence are upon the party asserting the incompetency of the defendant."

The court here accorded the defendant the full benefit of the statutory procedures governing the issue of competency. At the request of the defendant's first attorney the court ordered a competency examination at the state hospital early in the case and long before the scheduled sanity trial. This examination yielded a preliminary finding of competency which was not contested by defense counsel or the prosecuting attorney, thereby becoming a final determination under the provisions of section 16–8–111(2).

Although placing an accused on trial while he is incompetent violates due process of law, *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Jones v. District Court*, Colo., 617 P.2d 803 (1980), this is not to say that due process or the defendant's right to effective assistance of counsel requires the court to grant a request for a second competency determination after the accused already has been granted an adequate hearing on his claimed incompetency. A final determination of competency entered during the pretrial phase of a case and in accordance with the statutory standards governing the resolution of that issue is not without legal significance to pending and as yet unresolved proceedings. Such a determination means that the defendant is capable of understanding the nature and course of the proceedings then pending against him. and of participating and of assisting in his defense and of cooperating with his attorney. *See Parks v. Denver District Court*, 180 Colo. 202, 503 P.2d 1029 (1972); *Jones v. District Court, supra.* After a final determination of competency, the trial court is not required to order an additional competency examination merely because a request is made. Under the circumstances of this case we consider the proper inquiry to be whether the record establishes that the defendant was incompetent to proceed either at the sanity trial or at the trial on the merits.

A review of the record satisfies us that defendant was not placed on trial in either instance while incompetent to proceed. Defense counsel's request for a second competency determination was made prior to the sanity trial and within 90 days after the court's final determination of competency based on an examination at the state hospital. In addition to the competency examination, the court had the benefit of observing the defendant's demeanor during the course of judicial proceedings and had access to other psychiatric information. Prior to the commencement of the sanity trial there had been filed with the court psychiatric and psychological reports in connection with the defendant's insanity plea. If the court had reason to believe the defendant's mental condition had substantially deteriorated subsequent to the final determination of competency, it had the discretion to order additional examinations or make such other investigation as it deemed advisable. The expert testimony at the sanity trial, however, supports the conclusion that the defendant was then competent to proceed and there was no expert testimony indicating the defendant's condition would likely change in the foreseeable future.[9]   Section 16–8–111(1), C.R.S.1973

---

9. Shortly before the defendant's attorney moved for a second competency determination on April 29, 1977, Dr. Anne Courtwright had conducted a psychiatric examination on the defendant on March 17 and April 4, 1977, in connection with his insanity plea. In her testimony at the insanity trial in January 1978 she described the defendant's condition during her examination as follows:

"He said in his own mind he had no question that he knew the difference between right and wrong, that he did not think he was mentally ill. He felt that he did have some problems, some personality adjustment problems that he would like to have some help

(1978 Repl. Vol. 8). If at some later point in the trial proceedings defense counsel had reason to question the defendant's competency, he was not foreclosed from pursuing the matter but the issue of competency was never again raised. We find nothing in the record indicating a denial of due process of law or effective assistance of counsel in requiring the defendant to proceed to an insanity trial and later to a trial on the merits.[10]

### III.

The defendant also contends that the trial court committed reversible error in refusing to admit into evidence during the sanity trial his Colorado State Hospital records for the years 1970–74. The defendant offered the records to prove that he was committed to the state hospital in 1970 following an adjudication of insanity in his trial for forgery and that thereafter he was being treated as an out-patient at the time of the commission of the offenses in this case. We are satisfied that any error in the trial court's evidentiary ruling did not affect the substantial rights of the defendant and, under the circumstances of this case, was harmless.

In a sanity trial evidence of a prior mental illness or abnormal conduct is relevant to the ultimate issue in the case. *Trujillo v. People,* 150 Colo. 235, 372 P.2d 86 (1962).

Such evidence renders the claimed inference of insanity more probable than it would be without the evidence. *See People v. Calvaresi,* 198 Colo. 321, 600 P.2d 57 (1979). However, although the hospital records should have been admitted, their exclusion was harmless error under the circumstances here present. The trial court permitted the record custodian to testify to the defendant's 1970 commitment and his status as an out-patient at the time of the offenses charged against him. Furthermore, the significant details of the 1970 commitment, the ensuing hospital treatment and the conditional release in 1974 were recounted to the jury by the expert witnesses. Thus, the evidence which the defendant sought to admit by the hospital records was admitted through the testimony of other witnesses and the error in refusing to admit the records themselves must be deemed harmless. Crim.P. 52(a).

### IV.

The defendant next challenges the sufficiency of evidence to support the jury's finding of sanity. Basically, he argues that Dr. Courtwright and Dr. Simmons equated legal insanity with a mental disease, such as a psychosis, as distinguished from a mental defect stemming from a lack of self-control, and to this extent they deviated from the

---

with. He felt very strongly at that point in time that he really did not like the idea of being committed back to the hospital on a criminal commitment basis. He felt as he was talking to me that he would like to maybe be there on a voluntary basis to have a chance to work with some things. He didn't feel that he was crazy in the sense that he needed to be committed there on a long term basis.

\* \* \* \* \* \*

"As far as I could determine, he was reality bound. He did not appear to be distorting reality. There was no evidence of what we would call hallucinatory experiences, that he was hearing people talk to him or responding to things that were not obvious and apparent in the environment. I saw no evidence of real, what we would call, delusional thinking, in that he was distorting reality. He seemed to have a fairly clear grasp of what was happening and appeared to be interpreting it in a consistent manner."

Dr. Austin, another psychiatrist, examined the defendant on June 8 and August 14, 1977, in relation to his insanity plea and found no thinking disorder or psychotic illness. His diagnosis was antisocial personality disorder. This diagnosis was supported by Dr. Simmons, a clinical psychologist, who performed psychological tests on the defendant.

10. The defendant claims that section 16–8–110(1), C.R.S.1973 (1978 Repl. Vol. 8), is unconstitutional to the extent that it requires an accused to be tried on the issue of sanity despite his incompetence to proceed. We decline to address this because: (1) in view of the final determination of competency prior to the commencement of the sanity trial, the statute was never applied against the defendant; and (2) the defendant never objected to proceeding to the sanity trial because of his claimed incompetency, nor did he raise the issue in his motion for a new trial.

applicable statutory test of insanity. He further claims that Dr. Austin's opinion of sanity was inconsistent with his psychiatric findings on which his opinion was based. The defendant's arguments are not well taken.

Sections 16–8–101, C.R.S.1973 (1978 Repl. Vol. 8), sets forth the legal test of insanity as follows:

"The applicable test of insanity shall be, and the jury shall be so instructed: 'A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able so to distinguish, has suffered such an impairment of mind by disease or defect as to destroy the willpower and render him incapable of choosing the right and refraining from doing the wrong is not accountable; and this is so howsoever such insanity may be manifested, by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law."

A review of Dr. Courtwright's testimony indicates that she did not ignore the mental defect aspect of the insanity test. Her psychiatric opinion of sanity was not based on the absence of a mental disease or defect. Rather, her opinion was that the defendant did not suffer from a mental disease or defect of such magnitude as to render him incapable of distinguishing right from wrong or incapable of choosing the right and refraining from the wrong. The defendant specifically told Dr. Courtwright that he knew the difference between right and wrong and candidly added that "I am a good con-artist." In the doctor's opinion the defendant "has chosen to live by a different code of ethics than is socially acceptable, but that's a choice, not an illness."

Similarly, although Dr. Simmons, a clinical psychologist, expressed the opinion that a person unable to distinguish right from wrong would probably be institutionalized, his remarks do not reflect a dogmatic adherence to the proposition that one cannot be found insane if he is not in an institution. On the contrary, his testimony, when viewed in context, depicts a description in general terms of the level of mental incapacity which the statutory test of insanity seeks to address.

In the case of Dr. Austin's testimony, he conceded the defendant had been substantially out of control except when inside a structured setting. Nevertheless, his psychiatric opinion was that the defendant engaged in wrongful acts not from an inability to control his behavior but from a choice to act the way he did. We perceive no inconsistency between Dr. Austin's findings regarding the defendant's poor self-control and his opinion of sanity.

Without belaboring the issue further, we consider the defendant's challenges to the psychiatric and psychological testimony as going to the weight of the evidence rather than to its admissibility. The trial court properly received the opinion evidence and there was sufficient evidence to support the jury's finding of sanity. *See, e.g., People v. King,* 181 Colo. 439, 510 P.2d 333 (1973); *People v. Johnson,* 180 Colo. 177, 503 P.2d 1019 (1972); *Rupert v. People,* 163 Colo. 219, 429 P.2d 276 (1967).

## V.

The defendant argues that the photographic array was so impermissibly suggestive as to render the admission of the out-of-court identifications a violation of due process of law, *U.S.Const.* Amend. XIV, and that there was no basis for the in-court identification independent of the tainted array. We conclude otherwise.

■■ A defendant is denied due process of the law when an in-court identification is based on an out-of-court identification which is so unnecessarily suggestive as to render the in-court identification unreliable. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The sugges-

tiveness of an out-of-court identification is measured by the totality of circumstances, *Manson v. Brathwaite, supra; Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and here also reliability is the linchpin of admissibility. *Manson v. Brathwaite, supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. In determining reliability the court must weigh against the corruptive effect of any suggestive procedure such factors as the witness' opportunity to view the suspect during the commission of the crime, the witness' degree of attention, the accuracy of any prior description of the offense, the level of certainty demonstrated at the confrontation, and the temporal span between the crime and the confrontation. *Id.*

■ Turning to the facts of this case, we note that both witnesses were in the defendant's presence for a considerable period of time before and during the commission of the offenses. Their degree of attention during this period of time enabled them to relate specific and accurate identifying characteristics to the police before reviewing the photographic array. Both witnesses viewed the photographs separately and each made a positive identification shortly after the commission of the offenses.

■ Although the use of a photographic array with only three subjects is not an ideal method of insuring accuracy of identification, it is not, by itself, so inherently suggestive as to create a substantial likelihood of an irreparable photographic misidentification. *See Manson v. Brathwaite, supra.* Here the other photographs in the array depicted two persons with characteristics similar to those of the defendant. Additionally, there was no evidence of any suggestive markings on any of the photographs, nor did the officers offer any comments or engage in any actions that tended to influence the victims' choice. In short, the photographic identifications were not conducted in a manner likely to result in an unreliable misidentification of the defendant as the assailant.

Because we find the out-of-court identifications were not unconstitutionally sugges-

tive, it is unnecessary to address whether there was an independent basis for the in-court identifications of the defendant.

## VI.

■ We next address the defendant's argument that the admission of evidence of his refusal to sign the written *Miranda* advisement violated his constitutional privilege against self-incrimination. *U.S.Const.* Amends. V and XIV. We conclude that this evidence was improperly admitted but the error in admission was harmless beyond a reasonable doubt.

Although the prosecution offered evidence of the defendant's October 31 refusal to sign the *Miranda* advisement for the purpose of demonstrating the voluntariness of his custodial statement on November 1, the issue of voluntariness was never contested by the defendant. In point of fact, the defendant had stipulated to the voluntariness of the November 1 statement at the hearing on his motion to suppress. Evidence of silence at the time of arrest has little, if any, probative value and carries a significant potential for prejudice. *United States v. Hale*, 422 U.S. 71, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) the Supreme Court concluded that the use of an accused's post-arrest silence to impeach his testimony at trial violates due process of law. The Court noted that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." 426 U.S. at 617, 96 S.Ct. at 2244, 49 L.Ed.2d at 97. "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Id.*

The People attempt to distinguish evidence of a defendant's refusal to sign a *Miranda* advisement from his refusal to answer questions about the crime in question. We find the distinction untenable. A refusal to sign a written advisement is no less a form of post-arrest silence than a refusal to answer questions during a custodial interrogation. In either instance the use of such

evidence in the prosecution's case in chief is impermissible.[11]

In this case, however, the defendant made no objection to the testimony which he now challenges on appeal. The testimony was briefly elicited, was pursued no further, and neither was used to infer some other fact nor was it commented on by the prosecutor in summation. In view of the unchallenged admission into evidence of the defendant's statement, the absence of any suggestion of prosecutorial exploitation of the defendant's refusal to sign the written advisement, and the overwhelming evidence of guilt in the record, we are satisfied that the error here was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *People v. Myrick,* Colo., 638 P.2d 34 (1981).

## VII.

▮ Lastly, the defendant claims that he was denied due process of law because instruction No. 12 was internally inconsistent and omitted any reference to conduct. We find no merit to his argument for several reasons.

The defendant's challenge to instruction No. 12 centers on the following paragraph:

"Specific intent is a state of mind voluntarily and willfully to do or perform an act which will effect a certain result. Such an act must not be the result of accident or other innocent reason. The defendant's conscious object must be to cause a certain result."

The defendant interprets the references to "voluntarily and willfully" and "accident or other innocent reason" as in irreconcilable conflict with the definition of specific intent which the instruction sets forth. Instructions, however, must be read and interpreted as a whole. The challenged excerpts

are merely descriptive of the purposeful culpability required for a specific intent crime and must be read in conjunction with the last sentence of the instruction. That sentence clearly conveys the essence of specific intent: "The defendant's conscious object must be to cause a certain result."

Moreover, while the crime of first degree sexual assault presently requires the culpable mental state of knowingly, section 18–3–402(1)(b), C.R.S.1973 (1978 Repl. Vol. 8), on October 30, 1976, the date of the offense, the statutory definition contained no culpability element. At that time "intentionally" was defined in terms of a conscious object to cause a particular result or to engage in certain conduct. Section 18–1–501(5), C.R.S.1973. "Knowingly," on the other hand, was defined in terms of an awareness of conduct or of the particular circumstance under which the offender acted. Section 18–1–501(6), C.R.S.1973. Due to the higher degree of culpability attaching to "intentionally," the Colorado Criminal Code provided, as it does so now, that "[i]f acting knowingly suffices to establish an element, that element also is established if a person acts intentionally." Section 18–1–503(3), C.R.S.1973. Instruction No. 12, by defining first degree sexual assault as a specific intent crime, required the prosecution to prove a higher degree of culpability than otherwise required by law. The defendant could not have been prejudiced by this anomaly.

The defendant also argues that the reference to specific intent in instruction No. 12 referred only to the result of conduct and omitted any reference to the conduct itself. Instruction No. 14, however, informed the jury that the culpability of specific intent was deemed to apply to every element of the crime of first degree sexual assault unless its application was clearly limited. Thus, the prosecution was required to prove a higher degree of culpability than otherwise required by statute in relation to vari-

---

11. We express no opinion on the question whether under certain circumstances post-arrest silence may be admissible for impeach- ment purposes. *See Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

ous elements of the offense charged.[12] Clearly, any errors in the challenged instruction No. 12 inured solely to the benefit of the defendant.

Finally, we note that the defendant made no objection to instruction No. 12, as required by Crim.P. 30, and indeed approved it on the record. Under the totality of circumstances the defendant's appellate challenge to the instruction is devoid of merit.

The judgment is affirmed.

---

**12.** The elements of sexual assault in the first degree were listed in a separate instruction as follows: (1) the infliction of sexual penetration on the victim; (2) causing submission of the victim by threat of imminent death, serious bodily injury, or extreme pain, to be inflicted on anyone; (3) being armed with a deadly weapon and using the weapon to cause submission of the victim; and (4) the victim believing that the defendant has the present ability to execute these threats.