549 S.E.2d 40

STATE of West Virginia, Plaintiff
Below, Appellee,

v.

Lewis Franklin SANDERS, Defendant
Below, Appellant.

No. 28400.

Supreme Court of Appeals of
West Virginia.

Submitted March 6, 2001.

Decided May 16, 2001.

Gregory L. Ayers, Deputy Public Defender, Charleston, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Heather D. Foster, Assistant Attorney General, Charleston, for Appellee.

McGRAW, Chief Justice.

Lewis Franklin Sanders appeals his conviction on the charge of robbery with the use of a firearm, W. Va.Code § 61–2–12 (1961), and resulting forty-year sentence. This case presents two principal issues for the Court's consideration: First, Sanders asserts that the circuit court erred by refusing to grant his motion for a mistrial, where he claimed that he was not mentally competent to stand trial. Second, he argues that the forty-year sentence imposed by the trial court amounts to constitutionally impermissible punishment for exercising his right to a jury trial, where, prior to trial and in clear violation of West Virginia Rule of Criminal Procedure 11(e),

the court offered Sanders a sentence of thirty-years imprisonment if he chose to plead guilty. We find merit in Sanders' claim that the trial court abused its discretion in failing to direct additional inquiry into his mental competency at the close of trial, and accordingly reverse. Furthermore, based upon the trial court's violation of Rule 11(e), we direct that upon remand this case be assigned to a different judge.

## I.

### BACKGROUND

Sanders was arrested on April 17, 1994, shortly following an incident where, according to testimony presented at trial, he robbed Teresa Jessup at gunpoint on the parking lot of a Shoney's restaurant in South Charleston, West Virginia. Ms. Jessup left the restaurant at approximately 2:30 p.m., after finishing her morning waitressing shift, and walked to a nearby car. After she was seated in the vehicle, an African–American male in dark clothing with a hood over his face opened the car door and, while holding a gun, demanded money. A shoving contest ensued, with Ms. Jessup refusing to remain seated and the masked robber attempting to force her to stay in the car. When she finally reached a standing position, the robber put the gun to Ms. Jessup's head and again demanded all of her money, stating: "Give me your money. Now. I mean it." While Ms. Jessup initially indicated that she had no money, the robber's nervousness and statement, "I know you have money because you just got off from work," eventually persuaded her to produced several one dollar bills. Ms. Jessup was never able to see the assailant's face.

The robber fled the Shoney's parking lot on foot. A retired firefighter, John Clark, was driving his pickup a short distance from the site of the robbery when he heard a police bulletin regarding the incident over his scanner radio. Approximately one and one-half blocks away from the restaurant, he spotted a man fitting the description of Ms. Jessup's robber in an alleyway, heading toward a nearby set of railroad tracks. According to Mr. Clark, the man was acting "suspicious," in that he was "looking around

quite a bit." Mr. Clark drove to the Shoney's and told police about his observations. Another motorist, Lena Steele, who was driving on nearby Interstate 64, likewise heard a bulletin on her scanner radio which gave a description of the assailant and indicated that he was last seen near the railroad tracks that lay directly beneath the highway. After spotting an individual walking along I–64 that matched the description of the man wanted by police, Ms. Steele contacted authorities using her cellular phone.

Upon obtaining this information, Patrolman Larry Thomas of the South Charleston Police Department drove onto I–64 and pulled in behind a man walking beside the roadway, whom he later identified at trial as Sanders. Sanders immediately fled down the highway and then up an adjacent hillside, but halted after Patrolman Thomas drew his pistol and ordered him to stop. Sanders was found in possession of a dark sweatshirt with eye and nose holes cut out of the hood, a .22 caliber semi-automatic pistol, and several one dollar bills.

Sanders was indicted for robbery by the Kanawha County Grand Jury on June 30, 1994. Shortly prior to that date, Sanders' appointed counsel on June 2, 1994 moved for a mental status examination pursuant to W. Va.Code § 27–6A–1(a) (1983), indicating to the trial court that defendant was "delusional and unable to assist counsel." The defense motion was granted, and Sanders was subsequently examined on October 12 by Dr. Ralph Smith, M.D., a psychiatrist, and Dr. Rosemary Smith, Psy. D., a psychologist. In a report detailing their findings, these mental health professionals indicated that Sanders was acting "in a psychotic manner," as evidenced in part by delusional thinking regarding his involvement in a military "mission" to protect a Charleston chemical plant from Russian attack. The doctors further noted, however, that several tests "raise[d] a great suspicion of malingering as a sole explanation for his behavior." As a consequence, the report stated that because of the conflicting evidence at hand, no conclusive determination could be made concerning Sanders' competency to stand trial. Accordingly, it was

recommended that Sanders be placed in a state mental facility for further observation.

In response to these findings, the circuit court under authority of W. Va.Code § 27–6A–1(b) ordered that Sanders be admitted to the Forensic Unit of the South Central Regional Jail for a twenty-day observation period, which was later extended pursuant to a joint motion by the State and defense counsel. Clinical evaluation at the South Central Jail was completed in mid-December 1994, with the examining psychiatrist, Dr. Daniel Thistlewaite, M.D., and psychologist, Dr. David Clayman, Ph. D., both concluding that Sanders was incompetent to stand trial based upon bipolar disease and an effectively-based psychotic disorder. It was recommended that Sanders undergo protracted treatment with antipsychotic drugs.

The circuit court subsequently determined without a hearing that Sanders was incompetent to stand trial, and, on February 1, 1995, committed him to Sharpe Hospital in Weston, West Virginia, for a six-month improvement period pursuant to W. Va.Code § 27–6A–2(b). An initial report from Sharpe Hospital dated July 12 by forensic psychologist Dr. Theodore A. Glance, Ph. D., indicated that Sanders continued to suffer from a psychotic disorder and remained incompetent to stand trial. Pursuant to Dr. Glance's recommendation, the circuit court ordered an additional three-month period of examination and treatment. By September 1995, the clinicians charged with Sanders' care reported substantial improvement in his mental condition. While continuing to diagnose Sanders as suffering from a psychotic disorder, Dr. Glance stated in his second report that

> [r]eports noted in the progress notes and from the treatment team, including the psychiatrist Dr. Thomas Adamski and the various treatment team members, suggests that Mr. Sanders has improved considerably since the July, 1995 evaluation. He has been aggressively treated with medications. While he does not actively participate in programming, he is compliant and realistic in his daily behaviors. He has not been reporting thoughts which the treatment team described as delusional. No psychotic activity such as hallucinations are noted in the file by any shift worker. . . .
>
> Malingering has been a consideration of all previous evaluators. . . . Malingering remains an opinion of a few of the treatment team members. Malingering is not considered as part of this diagnosis since no[ ] symptoms were presented other than lack of memory of the alleged crime.

Based upon his finding that Sanders' psychotic disorder was being controlled by medication, Dr. Glance was of the opinion that he was able to assist counsel in mounting a defense at trial. The treating psychiatrist, Dr. Adamski, likewise concluded in a separate report that Sanders was fit to be returned for trial, and cautioned that "[o]ne must consider that he is now a veteran of the Mental Health System and that he may well malinger persecutory delusions in order to remain in the hospital." Sanders was later returned to the South Central Jail to await trial.

On December 14, 1995, the circuit court entered an agreed order authorizing Dr. Glance to enter the South Central Jail for purposes of interviewing and evaluating Sanders to determine whether he was criminally responsible for the charged offense. During a subsequent April 11, 1996 interview, Sanders became irate under questioning and threw a chair at Dr. Glance.[1] In a report issued immediately after the incident, Dr. Glance posited that the deterioration in the defendant's condition was likely caused by his refusal to comply with his medication needs. Dr. Glance further stated that Sanders' "competency to stand trial is suspect," and suggested that the defendant once more undergo a mental-status evaluation to determine whether he remained competent to stand trial. Shortly thereafter, the circuit court again committed the defendant to

---

1. Sanders' conduct apparently did not come as a complete surprise to Dr. Glance, who had previously been advised that the defendant exhibited unusual behavior at a status conference hearing held on March 11. At that hearing, Sanders at various times directed obscenities at persons in the courtroom, spoke in an unrecognizable tongue, alleged that the presiding judge was a "clandest[ine] mason," and challenged such judge to a game of chess.

Sharpe Hospital, where he remained until June 1997.

Prior to Sanders' return to the regional jail, Dr. Glance issued a report on May 27, 1997, where he observed that the defendant's mental status was "dramatically different" from that observed during the April 11, 1996 chair-throwing incident. While Sanders was diagnosed as suffering from paranoid schizophrenia, the circuit court was informed that the condition was in remission, and that the still-existent schizoid personality disorder suffered by Sanders did not render him incompetent to stand trial. Dr. Glance cautioned, however, that in the event Sanders' trial were not held promptly, it was likely that his condition would "disintegrate to the point of incompetency."

Upon his final return from Sharpe Hospital, Sanders was arraigned on July 7, 1997 and entered a plea of not guilty. At the same hearing, defense counsel requested and were granted leave to obtain further psychiatric and psychological evaluation for Sanders by experts of their choice. Sanders' counsel thereafter served notice under W. Va. R.Crim. P. 12.2(a) of the defendant's intent to rely upon an insanity defense at trial. On August 29, 1997, Sanders was examined by psychiatrist Dr. F. Joseph Whelan, M.D., who was chosen by defense counsel. Dr. Whelan, based upon his own observations as well as review of past reports, diagnosed Sanders as suffering from bipolar disorder, which he determined was in partial remission. He further indicated in a report dated December 1, 1997, that Sanders was not criminally responsible for the charged robbery, and was likewise incompetent to stand trial.

Defense counsel also arranged for Sanders to undergo an examination by Mari Walker, M.S., a licensed psychologist. In a report dated November 19, 1997, Ms. Walker stated that Sanders "appear[s] to this clinician to be suffering from psychological symptomatology which he denie[s]." She went on to state in her report:

Mr. Sanders fulfills the diagnostic criteria (DSM–IV) for Bipolar Disorder, NOS. He is not considered competent to stand trial. He would have difficulty objectively processing information, maintaining attention or making judgments for his own best benefit. . . . . . Continued psychiatric treatment is very strongly recommended.

At a December 1997 status hearing, the results of these most recent psychiatric and psychological evaluations were discussed, at which time defense counsel asserted that Sanders was incompetent to stand trial. After sparring between the State and defense counsel concerning whether Sanders should once more be sent to Sharpe Hospital for an improvement period, the trial court made clear that it would require a hearing [2] on the issue of defendant's mental competency prior to taking any further action in the case. At the conclusion of the status hearing, the court put the onus on defense counsel to promptly schedule a competency hearing for a time when it was convenient for their expert witnesses.

While the defense initially indicated its intention to proceed with a competency hearing in January 1998, no immediate action was taken. Rather, on July 8, 1998 the circuit court endorsed an agreed order permitting Dr. Glance to once more interview and evaluate Sanders regarding his competency to stand trial. In his final report, based upon an interview conducted on July 10, 1998, Dr. Glance observed that Sanders "did not evidence any psychotic symptoms such as loose associations, clanging, or neologisms." Echoing his earlier May 1997 report, Dr. Glance stated that Sanders' schizophrenia was in remission, in this instance without the use of medication, and that he was competent to stand trial.

A competency hearing was finally held on August 19, 1998. The sole witness at this proceeding, Dr. Glance, was called by the State. Based upon his July 10 examination, Dr. Glance testified that in his opinion Sanders was competent to stand trial. In reaching this conclusion, Dr. Glance observed that Sanders was no longer under medication, suggesting that he no longer "require[d] neuroplectic[ ] [drugs] to keep his mind free of

**2.** *See* W. Va.Code §§ 27–6A–1(d) & –2.

psychotic thought." As to the sustainability of Sanders' competency, however, defense counsel elicited the following testimony on cross-examination:

Q Doctor, ... if we were to schedule this trial ... within, let's say, the next month or so, based on your observations and your interview with my client ..., would my client's condition degenerate within the next month to such an extent that it perhaps renders the necessity of another competency hearing?

A Mr. Sanders, as I—he can get fired up and angry and irritated and I can't—it depends upon how angry and irritated he may get in the sense of how he is going to handle the anxiety.

Based on history, I know Mr. Sanders in personal experience with me has not done well over time when left to stew, so to speak, over an impending or upcoming legal event.

Q Would you suggest that this trial be held relatively expeditiously?

A Forthwith, yes, I would. There is a risk of disintegration, yes.

Defense counsel did not present any evidence on the issue of mental competency. One of Sanders' lawyers, Matthew Victor, stated during the hearing that "[i]f I wanted to send Mr. Sanders back to Weston,[3] I would have had two witnesses that could have testified about his incompetence. I have chosen not to bring in these witnesses because I do believe that Mr. Sanders is competent at this point ...." (Footnote added.) The circuit court, based in part upon Dr. Glance's unrebutted report and testimony, found Sanders competent to stand trial.

Sanders' trial did not commence until December 7, 1998. Defense counsel had sought and obtained a continuance from an earlier October trial date in order to have Sanders evaluated on the issue of criminal responsibility. Sanders was examined by Drs. Ralph Smith and Rosemary Smith[4] on October 16, 1998; however, it proved impossible to make any determinations as to the defendant's criminal responsibility at the time of the offense, since he refused to cooperate with the examining physician and psychologist. A report prompted by this incident was received by the circuit court on November 17, 1998, and appeared to raise serious questions concerning Sanders' present capacity to assist in his defense:

Mr. Sanders' diagnosis remains an enigma. His behavior at the time of the interview and his mother's report calls into question as to whether he has continued psychotic symptoms. By reports from the Sharpe Hospital and Forensic Unit at the South Central Regional Jail, Mr. Sanders did have psychosis that was evident in 1994, for which he was treated. However, he has been off medication over the last year and a half, has been uncooperative with his attorneys, was uncooperative with the psychiatric examination, seems peculiar to his mother, and may have symptoms that he is hiding.

The record of Sanders' trial is replete with evidence of irrational and self-defeating behavior. At the very outset of proceedings, Sanders at one point refused to enter the courtroom until his leg shackles were removed. A deputy charged with his transport stated at that Sanders was "rambling on"

---

**3.** Sanders at one point in the competency proceedings demanded new counsel, arguing that his lawyers' intended against his wishes to present an insanity defense that could result in further commitment to Sharpe Hospital. Sanders made clear his stance on this issue by stating, "I don't want to go back to Weston." It appears that defense counsel's actions at the competency hearing were informed by their client's desire to avoid further mental evaluation:

MR. VICTOR: What he apparently doesn't understand is that I really at this point do not know what kind of defense I'm going to put together, in light of the fact he does not want to return to Weston.

Maybe, after further consultation with my client, we'll decide if the defense of insanity or criminal responsibility by virtue of insanity is not available.

I don't know at this point. Mr. Sanders got today what he wanted. He is competent to stand trial. Now we will select a trial date. I will ask that it be done sometime the second half of September. That's why I asked the questions.

**4.** Both doctors had previously interviewed Sanders shortly following his arrest.

about his innocence, and how the court had already found him guilty. Once seated in the courtroom, it became apparent that Sanders desired to appear before the jury in his jail-issue orange jumpsuit, notwithstanding urging by counsel and the court that he change into street clothes. Defense counsel also made it clear on the record that Sanders was refusing, against their advice, to permit the introduction of any evidence bearing upon his criminal responsibility. Also, it became apparent that Sanders was refusing to permit one of his lawyers, Matthew Victor, to actively participate in the trial.

After the State completed its case-in-chief, the issue arose as to whether Sanders would testify on his own behalf. Defense counsel made the following statement:

> MR. HIVELY: Mr. Sanders at different times has told me he didn't want to testify; he does want to testify. As of last night, apparently he did not want to testify. Earlier, just this afternoon, he said he wants to testify.
>
> I told him that there would come a point when the Court would inquire as to his options; that the Court would instruct if he declined to testify, that they couldn't infer anything from that, but I feel at this point you have to inquire of Mr. Sanders.

A colloquy ensued between the trial court and the defendant, where Sanders indicated his intent to testify. Defense counsel subsequently requested an opportunity to talk alone with Sanders, and, following a brief recess, counsel informed the court as follows:

> MR. HIVELY: Your Honor, during the recess Mr. Victor and I talked with Mr. Sanders about testifying, what he would testify. Basically, he refuses to tell us what he would testify to. In prior interviews, we had an understanding of what he would say if he was called upon.
>
> We just wanted to narrow and just go over his testimony. He refused to tell us and said he wasn't going to tell us what he was going to testify to.
>
> Also, I would like to place on the record that based upon his behavior today in the courtroom, it is against my advice that he testify.
>
> THE COURT: It's what?

> MR. HIVELY: It would be against my advice for him to testify. If he testifies, it will be against my advice.
>
> I think that in testifying as a witness, the conversation with me, getting angry and carrying on, that on the witness stand if he carries on as well, then the jury can draw a negative inference from that.

Defense counsel requested a recess until the following day, but after Sanders insisted upon testifying "[t]his evening, right now," the trial court reluctantly acceded to the defendant's request and permitted him to take the witness stand.

In the course of direct examination by defense counsel, Sanders briefly and succinctly answered questions concerning his life history. When asked a question regarding his encounter with Ms. Jessup, however, the defendant proceeded to engage in a lengthy and largely incoherent monologue regarding the incident as well as his subsequent arrest. This was followed by Sanders refusing to answer several questions on grounds of self-incrimination:

> Q Why did you ask the woman, if you asked her, why did you ask her for money?
>
> A I plead the Fifth.
>
> Q That woman you asked for money, did you pull the gun on her?
>
> A No.
>
> Q But you asked for money because you just needed money, right?
>
> A That is not the case here. I want the lady that said I robbed her up there, not some other—she didn't even have glasses on. This is 1994.
>
> I'm sure if you've got a gun, you are going to wear your glasses.
>
> Q At some point, the officer stopped you, didn't he?
>
> A Yes.
>
> Q Did he recover a gun from you?
>
> A I plead the Fifth.
>
> Q You had a gun because somebody had robbed you before, right?
>
> A I plead the Fifth.
>
> Q And you used that for your protection?

A I plead the Fifth.

Q But on April 17th, you didn't rob anybody, did you?

A I plead the Fifth. Robbery is not the point here. . . .

Sanders likewise refused to answer the sole question posed on cross-examination, which asked if he was carrying a black hooded sweatshirt when arrested.

At the close of evidence on the first day of trial, following the additional testimony of two character witnesses, one of Sanders' lawyers moved for a mistrial, stating that "that the psychosis that he has suffered from '94 off and on, different doctors and evaluations, is still evident." [5] The trial court denied the motion, indicating only that it was "for the same reasons I've already put on the record." The jury found Sanders guilty of robbery the following day after deliberating only 38 minutes, and answered an interrogatory concerning his use of a firearm in the affirmative. Sanders was subsequently sentenced to forty-years imprisonment pursuant to W. Va. Code § 61–2–12. A motion for a new trial predicated upon Sanders' purported lack of mental competency at the time of trial was later denied by the trial court, and this appeal followed.

## II.

### DISCUSSION

#### A. Additional Competency Determination

Sanders asserts that the circuit court erred by refusing to grant a mistrial in order to permit a second competency hearing and associated psychiatric evaluation. In support of this contention, Sanders presents three arguments: First, he argues that the circuit court was obligated to revisit the issue of competency and order further psychiatric evaluation based on its purported failure to comply with W. Va.Code § 27–6A–1(a),

where the court had previously ordered that the last in a long series of mental competency examinations preceding the August 1998 competency hearing be performed by a psychologist, rather than a psychiatrist. Second, Sanders claims that by waiting over three months to commence trial, the court below violated the requirement of W. Va. Code § 27–6A–2(b), which mandates that criminal proceedings commence "forthwith" following a hearing wherein a defendant is found mentally competent. And finally, Sanders argues that the trial court's inaction denied him the right to procedural due process as secured by both the federal and West Virginia constitutions,[6] in that his bizarre behavior at trial, when viewed in light of a documented history of serious mental disease and previous expert testimony pointing to the potential for his mental condition to degenerate over time, raised sufficient doubt as to Sanders' continued mental fitness to warrant an additional inquiry regarding his competency to stand trial. We find this latter argument persuasive.

No principle is more firmly enmeshed in Anglo–American criminal jurisprudence than the prohibition against subjecting a mentally incompetent defendant to trial. The United States Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' " *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996) (quoting *Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992)); *see Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956) (per curiam). This Court has likewise reiterated that " '[i]t is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent.' *State v.*

---

**5.** Prior to jury deliberation the following day, Sanders' other lawyer, Mr. Victor, stated that "Mr. Sanders has been found competent to stand trial, and I believe that there is some truth to that, that he understands basic proceedings in court and maybe can communicate a couple of things to us." This statement was made following the trial court's ruling on the motion for a

mistrial, in the context of counsel once again making a record regarding the defendant's refusal to permit an insanity defense to be raised at trial.

**6.** *See* U.S. Const. amend. XIV, § 1; W. Va. Const. art. III, § 10.

*Cheshire,* 170 W.Va. 217, 219, 292 S.E.2d 628, 630 (1982).'' Syl. pt. 5, *State v. Hatfield,* 186 W.Va. 507, 413 S.E.2d 162 (1991); *see also State v. Milam,* 159 W.Va. 691, 226 S.E.2d 433 (1976); *State v. Harrison,* 36 W.Va. 729, 15 S.E. 982 (1892).

 The requirement that a criminal defendant be mentally competent during the course of critical proceedings vindicates those constitutional rights that are fundamental to a fair trial:

> "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."

*Cooper,* 517 U.S. at 354, 116 S.Ct. at 1376–77 (quoting *Riggins v. Nevada,* 504 U.S. 127, 139–40, 112 S.Ct. 1810, 1817–18, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring in judgment) (citation omitted)). As a result of this emphasis on an accused's ability to muster an adequate defense at trial, the minimal threshold for competency requires that a defendant have both a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' " and " 'a rational as well as a factual understanding of the proceedings against him.' " *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam). This Court recognized this basic standard for competency when it stated that

> "[n]o person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him."

Syl. pt. 6, *State v. Barrow,* 178 W.Va. 406, 359 S.E.2d 844 (1987) (quoting syl. pt. 1, *Milam, supra*).

 A defendant has both a substantive and a procedural due process right to avoid being tried while mentally incompetent. *See*

*Burket v. Angelone,* 208 F.3d 172, 192 (4th Cir.2000) (distinguishing between substantive and procedural incompetency claims); *Walker v. Attorney General for State of Oklahoma,* 167 F.3d 1339, 1343–44 (10th Cir.1999) (same); *Medina v. Singletary,* 59 F.3d 1095, 1106 (11th Cir.1995) (same). In order to bring a successful substantive competency claim, a defendant must prove that he or she was, in fact, incompetent at trial. *Burket,* 208 F.3d at 192 (citations omitted). As for a procedural due process claim such as advanced in the present case, a defendant need only demonstrate that he or she was denied an adequate procedure for determining mental competency after the trial court was presented with evidence sufficient to prompt good faith doubt regarding incompetency. *Pate v. Robinson,* 383 U.S. at 385–86, 86 S.Ct. at 842; *see Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975) (explaining that *Pate* held "that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial"); *State v. Arnold,* 159 W.Va. 158, 162–63, 219 S.E.2d 922, 925 (1975).

 Importantly, since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its obligation to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties. *See Cooper v. Oklahoma,* 517 U.S. at 354 n. 4, 116 S.Ct. at 1377 n. 4 (citing *Pate,* 383 U.S. at 384, 86 S.Ct. at 841). In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the court, whether through formal motion by one of the parties or as a result of information that becomes available in the course of criminal proceedings.

 While the Supreme Court has never "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure" for determining competency, the Court has explained that "evidence of a de-

fendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but ... even one of these factors standing alone may, in some circumstances, be sufficient." *Drope,* 420 U.S. at 172, 180, 95 S.Ct. at 904. This Court in syllabus point five of *State v. Arnold, supra,* recognized the *Drope* criteria for determining whether broad inquiry into a defendant's mental competence is constitutionally required:

> Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his [or her] discretion [to order an inquiry into the mental competence of a criminal defendant].

■■■ In accord with the constitutional mandate set forth in *Pate* and *Drope,* W. Va.Code § 27–6A–1(a) permits a magistrate or judge to order a psychiatric evaluation whenever there is sufficient cause to believe that a defendant is either incompetent to stand trial or not criminally responsible for the charged offense due to mental illness, mental retardation, or addiction.[7] Significantly, the statute sanctions such recourse "at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant." As the United States Supreme Court emphasized in *Drope,* "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a chance that would render the accused unable to meet the standards of competence to stand trial." 420 U.S. at 181, 95 S.Ct. at 908. Thus, the fact that a

defendant has been afforded a mental status evaluation and later been found competent to stand trial following an adversarial hearing does not relieve a trial court of its responsibility to remain watchful and vigilant as to the possibility that the defendant may lapse into incompetency during the course of subsequent proceedings.

■■■ Despite this continuing obligation, most courts have nevertheless concluded that earlier competency determinations which follow professional evaluation and adequate hearing should not be without consequence. As the Colorado Supreme Court rightly surmised, "[a] final determination of competency entered during the pretrial phase of a case and in accordance with the statutory standards governing the resolution of that issue is not without legal significance to pending and as yet unresolved proceedings." *People v. Mack,* 638 P.2d 257, 263 (Colo.1981); *see also State v. Potter,* 109 Idaho 967, 969–71, 712 P.2d 668, 670–71 (1985). In accord with this approach, most courts take the position that " 'when a competency hearing has already been held and defendant has been found competent to stand trial ... a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding.' " *People v. Kelly,* 1 Cal.4th 495, 3 Cal. Rptr.2d 677, 822 P.2d 385, 412 (citation omitted), *cert. denied,* 506 U.S. 881, 113 S.Ct. 232, 121 L.Ed.2d 168 (1992); *see also State v. Lockwood,* 160 Vt. 547, 555, 632 A.2d 655, 660 (1993) (refusing to overturn trial court's refusal to order new competency proceedings where there was nothing in record "point[ing] to any changed circumstances that would have indicated to the court the need for a new inquiry into defendant's com-

---

7. W. Va.Code § 27–6A–1(a) provides, in pertinent part:

> Whenever a court of record, or in the instance of a defendant charged with public intoxication a magistrate or other judicial officer, believes that a defendant in a felony case or a defendant in a misdemeanor case in which an indictment has been returned, or a warrant or summons issued, may be incompetent to stand trial or is not criminally responsi-

ble by reason of mental illness, mental retardation or addiction, it may at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist, or in the instance of an individual charged with public intoxication, an alcoholism counselor....

petence"); *Potter,* 109 Idaho at 970, 712 P.2d at 671 (concluding that trial court was not required to order second mental evaluation "without facts in the record showing [defendant's] mental condition had changed since the previous evaluation"); *United States v. Voice,* 627 F.2d 138, 141 (8th Cir.1980) (refusal to conduct a second competency hearing must be affirmed unless the court abused its discretion in light of new evidence); *State v. Drayton,* 270 S.C. 582, 243 S.E.2d 458, 459 (1978) ("The record fails to show additional facts to warrant the trial judge in directing a further examination and hearing."); *State v. Jemison,* 14 Ohio St.2d 47, 52, 236 N.E.2d 538, 541 (affirming trial court's refusal to grant second competency hearing, where there was no showing that defendant's mental condition had changed since initial competency determination), *cert. denied,* 393 U.S. 943, 89 S.Ct. 312, 21 L.Ed.2d 280 (1968).

█ We therefore hold that where a criminal defendant has already been afforded a competency hearing pursuant to W. Va. Code §§ 27–6A–1(d) & –2 and been found mentally competent to stand trial, a trial court need not suspend proceedings for purposes of permitting further psychiatric evaluation or conducting an additional hearing unless it is presented with new evidence casting serious doubt on the validity of the earlier competency finding, or with an intervening change of circumstance that renders the prior determination an unreliable gauge of present mental competency.

█ Because a trial court is able to observe the demeanor of the defendant and consequently has a better vantage point than this Court to make determinations regarding mental competency, we will disturb a lower court's ruling denying a psychiatric examination and related proceedings only where there has been an abuse of discretion. *State v. Arnold,* 159 W.Va. at 163, 219 S.E.2d at 925. While we have sometimes cautioned that "[w]hen a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion

for psychiatric evaluation," syl. pt. 4, *State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649 (1980),[8] the present case logically requires a more flexible approach to appellate review, since the trial court already had before it considerable evidence relating to the defendant's fitness for trial, and was therefore in a posture to make a more conclusive determination as to whether either new evidence or changed circumstances warranted further proceedings bearing upon Sander's mental competency. In order to demonstrate that the lower court abused its discretion in refusing to afford him an additional competency proceedings, Sanders "must show facts such that a reasonable trial judge should have experienced doubt about the accused's continued competency to stand trial." *Reynolds v. Norris,* 86 F.3d 796, 801 (8th Cir.1996); *see also United States v. Crews,* 781 F.2d 826, 833 (10th Cir.1986) (appellate court "must determine whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial").

█ **1.** *Pate* **Violation.** The present case demonstrates a compelling set of circumstances warranting a formal reassessment of the defendant's mental competency. No one disputes that Sanders suffers from a serious and oftentimes debilitating mental illness, and that such malady had previously rendered him incompetent to stand trial. Of particular importance in this case is the fact that Sanders' trial did not commence until five months after he was last examined by Dr. Glance. *See State v. Lafferty,* 20 P.3d 342, 360 (Utah 2001) ("The decision to conduct yet another hearing ... depends on the 'showing made, and the length of time elapsed from the prior psychiatric examination.' ") (quoting *United States v. Cook,* 418 F.2d 321, 324 (9th Cir.1969)). While such relatively short delay would not ordinarily raise concerns regarding a defendant's continued competency, it became significant in

---

**8.** *See also State v. Moore,* 193 W.Va. 642, 646, 457 S.E.2d 801, 805 (1995) ("Although [W. Va. Code § 27–6A–1(a)] states that the court 'may' order an examination, we have previously held

that the trial court has no discretion to deny a request for mental examination of a defendant if an appropriate request has been made.") (citations omitted).

light of Dr. Glance's previous caveat that Sanders' mental competency could possibly degenerate once more if the trial was not commenced "forthwith." *See People v. Mack,* 638 P.2d at 263 (indicating that court would give weight to any previous "expert testimony indicating the defendant's condition would likely change in the foreseeable future") (footnote omitted).

And not least, the trial court had in its possession a report prepared by Doctors Ralph and Rosemary Smith concerning their examination of the defendant on October 16, 1998—less than two months before trial. Although the underlying examination was geared toward determining criminal responsibility, it nevertheless raised serious concerns as to whether Sanders was mentally competent to stand trial. The report noted that he had been off medication for over one and one-half years, was uncooperative with defense counsel, and that "[h]is behavior at the time of the interview ... calls into question as to whether he has continued psychotic symptoms." It was therefore surmised that Sanders "may have symptoms that he is hiding." Significantly, the possibility of malingering had been previously rejected by most of the mental health professionals who had observed and/or treated the defendant.

■ In light of the fact that the psychological assessment that informed the trial court's original competency determination was partly contingent upon an immediate trial that did not materialize, we find that this later psychiatric report, particularly when viewed in conjunction with the defendant's aberrant behavior at trial, constituted a sufficient change of circumstance to raise good faith doubt as to Sanders' continued mental fitness for trial. Sanders in most instances completely ignored sound advise from both his counsel and the trial court.[9] While a criminal defendant undoubtedly has the right to act foolhardily in managing his or her defense, we have nevertheless recognized that when other factors point to the possibility of mental incompetency, a court should be particularly cautious where a defendant fails to cooperate with and abide by the advise of counsel. *See State v. Hatfield,* 186 W.Va. 507, 512, 413 S.E.2d 162, 168–69 (1991) (finding plea colloquy insufficient based in part upon defendant's prior suicide attempt and entry of guilty plea against advise of counsel).

■ Moreover, at least one of Sanders' lawyers, after observing the defendant's conduct both inside and outside the courtroom, indicated toward the end of trial that his client's "psychosis ... [was] still evident." Although courts are not required to accept without question defense counsel's representations concerning a client's competence, "an expressed doubt in that regard by one with 'the closest contact with the defendant' ... is unquestionably a factor which should be considered." *Drope,* 420 U.S. at 177–78 n. 13, 95 S.Ct. at 906 n. 13 (citation omitted).

Consequently, we conclude that the trial court in this case abused its discretion by failing to undertake further inquiry into the defendant's mental competency. In making this legal determination we must stress, however, that the Court is not expressing any opinion as to whether Sanders was, in fact, mentally incompetent at the time of trial.

■ **2. Retrospective Competency Hearing.** Our finding that Sanders' right to procedural due process was presumptively violated by the trial court's refusal to undertake an additional competency determination does not end the present inquiry. We note that although the defense moved for a mistrial in order to facilitate additional psychiatric evaluation, such a drastic remedy was not necessarily required in order to protect Sanders' constitutional rights, as the trial court could have ordered that appropriate procedures to determine competency be implemented immediately following trial. *See Drope,* 420 U.S. at 182, 95 S.Ct. at 909 (posttrial competency hearing "may have advantages, at least where the defendant is present at the trial and the appropriate inquiry is implemented with dispatch"). The question

---

**9.** Although we disagree with the trial court's ultimate ruling in this case, we take this opportunity to observe that the court otherwise exhibited considerable patience in determining the matter of the defendant's mental competency, and likewise showed commendable restraint in dealing with his sometimes obstreperous conduct during proceedings below.

that the Court must now address is whether such a *nunc pro tunc* competency determination is appropriate at this late juncture.

 Retrospective ascertainment of a defendant's mental fitness to stand trial is disfavored. *See Drope,* 420 U.S. at 183, 95 S.Ct. at 909; *Pate,* 383 U.S. at 387, 86 S.Ct. at 843; *Dusky v. United States,* 362 U.S. at 403, 80 S.Ct. at 789. While recognizing the inherent difficulty of making after-the-fact competency determinations, the federal courts of appeals have nevertheless permitted *nunc pro tunc* competency hearings "whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." *Moran v. Godinez,* 57 F.3d 690, 696 (9th Cir.1994), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995); *see also Reynolds v. Norris,* 86 F.3d 796, 802–3 (8th Cir.1996); *Watts v. Singletary,* 87 F.3d 1282,1286–87 n. 6 (11th Cir.1996); *Cremeans v. Chapleau,* 62 F.3d 167, 169 (6th Cir.1995), *cert denied,* 516 U.S. 1096, 116 S.Ct. 822, 133 L.Ed.2d 765 (1996); *United States v. Renfroe,* 825 F.2d 763, 767–68 (3rd Cir.1987); *Wheat v. Thigpen,* 793 F.2d 621, 630 (5th Cir.1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987). "A 'meaningful' determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original ... proceedings." *Reynolds,* 86 F.3d at 802 (citation omitted).

 In making a determination as to whether it is appropriate to remand a case for purposes of permitting a retrospective competency hearing, an appellate court should consider the following factors:

(1) the passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior compe-

tency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and the defendant, and jail officials.

*Clayton v. Gibson,* 199 F.3d 1162, 1169 (10th Cir.1999) (citing *Reynolds v. Norris,* 86 F.3d at 802–3; *Moran v. Godinez,* 57 F.3d at 696), *cert. denied,* 531 U.S. 838, 121 S.Ct. 100, 148 L.Ed.2d 59 (2000). The State at all times bears the burden of showing that such "tools of rational decision are available." *Lokos v. Capps,* 625 F.2d 1258, 1268 n. 5 (5th Cir. 1980).[10]

Applying these factors to the case *sub judice,* we discern no clear impediment to a retroactive assessment of Sanders' mental competency at trial. While over two years have elapsed since defendant was convicted and sentenced, this is not so long a period as to render it impossible to ascertain whether Sanders was in fact competent at the time of his trial in December 1998. In any event, "the passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." *Reynolds,* 86 F.3d at 803 (citation omitted). The record of this case contains a significant body of medical evidence concerning Sanders' mental illness, obtained from a course of evaluation and treatment spanning over four years. While there is nothing to indicate that Sanders underwent psychological evaluation contemporaneous with trial, he was nevertheless examined by Doctors Ralph and Rosemary Smith just two months before. Moreover, Sanders' conduct and testimony at trial are well documented in the record, which should permit those medical professionals who previously had close and extended contact with

10. This burden is borne by the State because, as one court observed, a *nunc pro tunc* competency hearing is nothing more than "a harmless error determination in disguise." *James v. Singletary,* 957 F.2d 1562, 1571 n. 14 (11th Cir.1992), *cert. denied,* 510 U.S. 896, 114 S.Ct. 262, 126 L.Ed.2d 214 (1993). As the Eleventh Circuit noted, "*Pate,* in essence, established a rebuttable presumption of incompetency upon a showing by a

habeas petitioner that the state trial court failed to hold a competency hearing on its own initiative despite information raising a bona fide doubt as to the petitioner's competency. According to *Pate,* the state could rebut this presumption by proving that the petitioner in fact had been competent at the time of trial." 957 F.2d at 1570 (footnote omitted).

# 382

Sanders to provide some insight into his competency at trial. Finally, there is no reason to doubt the ready availability of witnesses, most notably defense counsel, who can testify as to Sanders' mental state in December 1998. We therefore see no reason to prohibit the trial court on remand from attempting a *nunc pro tunc* hearing for purposes of determining whether the defendant was mentally competent at the time of trial.

## B. *Sentencing*

■ Sanders also claims that his forty-year sentence is constitutionally impermissible in that prior to trial the circuit court violated West Virginia Rule of Criminal Procedure 11(e)(1) [11] by offering Sanders a sentence of thirty-years imprisonment if he chose to plead guilty. According to the defendant, such disparity raises an inference of retaliation [12] that is not dispelled by the record. The State does not contest that the court below violated Rule 11(e)(1), [13] but argues that there is nothing in the record indicating that the court below acted vindictively in imposing a sentence greater than that offered during plea discussions. [14] Since we vacate the underlying conviction on other grounds, the Court will address this issue with an eye toward future proceedings.

■ This Court previously admonished in *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469

---

**11.** Rule 11(e)(1) provides:

(e) Plea Agreement Procedure.

(1) In General. The attorney for the state and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the state will do any of the following:

(A) Move for dismissal of other charges; or

(B) Make a recommendation or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; or

(C) Agree that a specific sentence is the appropriate disposition of the case; or

(D) Agree not to seek additional indictments or informations for other known offenses arising out of past transactions.
*The court shall not participate in any such discussions.*
(Emphasis added.)

**12.** *See* syl. pt. 7, *State v. Meadows*, 170 W.Va. 191, 292 S.E.2d 50 (1982) ("Punishment cannot be increased merely because one decides to pursue his right to trial. Our law does not reward those who plead guilty and punish those who proceed to trial and are convicted by a judge or jury."), *overruled on other grounds*, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994).

**13.** The transcript of the August 19, 1998 competency hearing leaves room for no other conclusion. At the commencement of this hearing, there were indications that Sanders was disposed to enter into a plea agreement, and a discussion ensued between the defendant and the court regarding possible sentencing. Sanders suggested that he would receive, at most, a 5–to–18 year sentence if he pleaded guilty, whereupon the court below noted that such punishment did not apply where the robbery involved use of a firearm. The discussion continued:

THE DEFENDANT: You are the judge and she's the prosecutor. You all can't tell me you ain't seen two-to-ten's and five-to-eighteen's go through here back and forth on robbery in Charleston, West Virginia.

THE COURT: It hasn't happened.

THE DEFENDANT: Yes it has. Come on. It's even in law books from back in the days people get some kind of plea bargains. People in Moundsville getting five-to eighteen. That's what I'm saying. Nobody is going to sign an open plea bargain and get twenty-one to thirty years and the prosecutor stand silent. If I go to trial, are you going to give you [sic] ten more years for not signing the plea bargain? That's my punishment. Well, punish me.

THE COURT: Do want me to tell you how many years I'm going to give you?

THE DEFENDANT: I'm not going to sign no twenty-one to thirty years. In know if I go to trial and lose, you are going to load me up with a bunch of years.

THE COURT: Well, do want me to tell you how many years I'll give you if you plead guilty? Is that what you want to know?

THE DEFENDANT: Yes.

THE COURT: I'll give you thirty years.

The trial court went on to explain to Sanders that if he chose to go to trial and was found guilty, that the resulting sentence could be different.

**14.** The State also argues that the defendant waived the present issue by failing to lodge an objection on this ground at sentencing. As we indicated in *State ex rel. Brewer v. Starcher*, 195 W.Va. 185, 465 S.E.2d 185 (1995), however, even where such issue is not preserved, "judicial participation in plea negotiation is so inherently dangerous, an appellate court should raise the issue *sua sponte* and order appropriate relief." *Id.* at 196 n. 14, 465 S.E.2d at 196 n. 14 (citing *United States v. Corbitt*, 996 F.2d 1132, 1135 (11th Cir.1993)).

(1995), that "Rule 11(e)(1) prohibits absolutely a trial court from all forms of judicial participation in or interference with the plea negotiation process." *Id.* at 406, 456 S.E.2d at 487. As we explained in *Sugg,*

> [t]here are ... good reasons for the rule admitting of no exceptions. First and foremost, it serves to diminish the possibility of judicial coercion of a guilty plea, regardless of whether the coercion would cause an involuntary, unconstitutional plea. Second, such involvement is likely to impair the trial court's impartiality. A judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement and, therefore, may resent a defendant who rejects his advice. Third, judicial participation in plea discussions creates a misleading impression of the judge's role in the proceedings. As a result of his participation, the judge is no longer a judicial officer or a neutral arbiter. Rather, he becomes or seems to become an advocate for the resolution he suggests to the defendant. For these reasons, Rule 11(e)(1) draws a bright-line prohibiting judicial participation in plea negotiations.

193 W.Va. at 407, 456 S.E.2d at 487–88.

 As a consequence of the lower court's obvious violation of Rule 11(e)(1) and the detached neutrality that it commands in the context of plea bargaining negotiations, we are left with no alternative but to require that upon remand this case be assigned to a different judge. *See State ex rel. Brewer v. Starcher,* 195 W.Va. 185, 196–97, 465 S.E.2d 185, 196–97 (1995). Moreover, should it subsequently be found that Sanders was competent at the time of his original trial, such judge should resentence the defendant to no more than the previously offered thirty years,[15] as we find nothing in the record affirmatively showing that the escalation in sentence was not the result of Sanders' refusal to plead guilty. *See United States v. Stockwell,* 472 F.2d 1186, 1187–88 (9th Cir.) ("once it appears in the record that the court has taken a hand in plea bargaining, that a tentative sentence has been discussed, and that a harsher sentence has followed a breakdown in negotiations, the record must show that no improper weight was given to the failure to plead guilty"), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *see also State v. Moore,* 4 Neb.App. 564, 582, 547 N.W.2d 159, 171 (1996) ("[W]hen a judge advises the defendant of the penalty that would be imposed upon a plea of guilty and then imposes a significantly harsher sentence when the defendant is found guilty after trial, the judge bears the burden of establishing that the increased sentence is due solely to the facts of the case and the personal history of the defendant."); *State v. Baldwin,* 192 Mont. 521, 527–28, 629 P.2d 222, 225 (1981) ("a sentencing court which becomes involved in the plea bargaining process, and which imposes a harsher sentence after trial than was offered in exchange for a guilty plea, must specifically point out factors that justify the increased sentence"); *see generally* 5 Wayne R. LaFave, et al., *Criminal Procedure* § 21.2(c), at 52–4 (2d ed.1999).

## III.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Kanawha County is vacated and this case is remanded for purposes of conducting a hearing to determine, if possible, whether defendant Sanders was mentally competent at the time of trial, and for such other proceedings as are consistent with this opinion. Should it be determined following the *nunc pro tunc* competency hearing that Sanders was incompetent at the

---

**15.** *See People v. Scott,* 256 Ill.App.3d 844, 855, 194 Ill.Dec. 959, 967, 628 N.E.2d 456, 464 (1993) (where trial judge offered ten-year sentence if defendant pled guilty and later imposed thirty-year sentence following trial, it was held that upon remand for unrelated error "if the new trial results in a guilty verdict, the sentencing judge should give proper consideration to the previous sentencing offer, even if it is a different judge who did not participate in the prior plea offer") (citation omitted); *cf. United States v. Adams,* 634 F.2d 830, 840–42 (5th Cir.1981) (where defendant refuses to plead guilty and is later convicted after standing trial, the remedy for violation of Fed. R.Crim. 11(e)(1) is remand and reassignment of case to different judge for resentencing).

time of trial, or that there is an insufficient evidentiary basis upon which to make such a determination, he should receive a new trial. Inasmuch as the presiding judge below previously extended a sentencing offer in connection with ongoing plea negotiations, the circuit clerk is instructed upon remand to assign this case to another judge of the Thirteenth Judicial Circuit. In the event it is concluded that Sanders was competent at the time of his original trial, such judge should resentence the defendant to no more than thirty years imprisonment.

Vacated and remanded with directions.

Justice MAYNARD dissents.