# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0963** (Kanawha County 18-F-646)

**Miranda T.,**
**Defendant Below, Petitioner**

**FILED**
**December 7, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Miranda T., by counsel George Castelle, appeals the order of the Circuit Court of Kanawha County, entered on September 24, 2019, sentencing her to imprisonment in the state penitentiary for concurrent terms of one to three years upon her conviction of child neglect resulting in injury, and one to five years upon her conviction of child neglect causing substantial risk of serious bodily injury or death. Respondent State of West Virginia appears by counsel Gordon L. Mowen II.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Miranda T. was indicted in the Circuit Court of Kanawha County on charges of child neglect resulting in injury and child neglect creating substantial risk of serious bodily injury or death after her nine-month-old son ingested methamphetamine while in her care. She was tried before a jury in May of 2019. During the trial, Ms. T. was outspoken, disrespectful, and prone to indecorous behavior. She interrupted witness testimony on multiple occasions (both in and out of the presence of the jury), sometimes employing obscene language. The circuit court exercised commendable patience in response to Ms. T.'s conduct.

On the second day of trial, the circuit court excused the jury and conducted a hearing on a motion in limine to determine the admissibility of Ms. T.'s pretrial statement. During this hearing, Ms. T. verbally lashed out during the investigating officer's testimony, prompting Ms. T.s counsel to address the court:

You[r] honor, I am going to move for a mistrial. I have got . . . three reasons for it.

The first is that [Ms. T.] came back and said, told me she can't physically continue until the end of this trial. That she is certainly—the [c]ourt can inquire of her. But she says she is feeling so ill, specifically, with a headache, that she can't even continue to sit here and do the trial.

The next reason is, that there have been a number of outbursts by my client on the record in the courtroom that, that I believe might rise to the level of . . . tainting the jury or prejudicing the jury. . . .

And the third, is when there was an issue right before the break about [Ms. T.] having to stay on this floor, she went out into the hallway and there was some verbal outburst[], we were in the courtroom, so I don't know what she said.

But I do know that when I went out in the hallway there was one juror who was out there at the time that this was going on. I don't know what the juror heard. But they certainly crossed paths.

The court denied the motion for a mistrial but called the jurors back and inquired whether any juror had witnessed an event that would affect his or her ability to impartially evaluate the evidence. No juror answered affirmatively. As the day progressed, Ms. T. continued to exhibit disruptive behavior that required the circuit court to advise her (outside the presence of the jury) to "chill out" and allow her attorney to represent her. This admonishment was delivered during a recess when Ms. T. expressed her opinion that the bailiff was "following" her. In response, Ms. T.'s counsel renewed the motion for a mistrial, but Ms. T. said that a mistrial would be "pointless" and that she would prefer to "get this over with." The renewed motion was denied.

The trial proceeded, and Ms. T. continued to interrupt witness testimony. In addition, her vociferous criticisms of her own counsel increased as the day progressed. She loudly contradicted him (outside the presence of the jury) as he argued a motion for her acquittal. Ms. T.'s counsel again renewed the motion for a mistrial, and the circuit court reiterated its denial. When asked if counsel had other motions, counsel responded, "[B]ased on some of the things that have incurred (sic), even during today's proceedings, I am not sure that we can say that [Ms. T.] is competent to be standing trial at this moment based on the various events during the day." He did not, however, request relief. The court countered, "All I can say is that your client's taken an active role in her defense. I will deny that motion."

The trial transcript reflects that Ms. T. offered commentary at least four times during the State's closing argument, but her crude behavior substantially increased when her own counsel spoke. She addressed or contradicted him numerous times during his closing argument, asked him to "stop" more than once, and instructed him to "[j]ust shut the f—k up" and "[s]it the f—k down." At this point, the circuit court temporarily dismissed the jury and instructed the bailiff to remove Ms. T. from the courtroom to a location where she could watch the remainder of the proceedings by video.

2

Ms. T. was found guilty of the two counts with which she was charged. At the conclusion of trial proceedings, her counsel addressed the court:

I haven't gone on the record since [Ms. T.] was tasered in the hallway.

It's clear to me from the volume that we heard what was going on in the courtroom, that the jurors would have heard it too, and impacted their ability to reach a fair verdict in this case without feeling negatively about [Ms. T.]

So I just wanted to make sure a record is being made that that occurrence was certainly heard by the jury and would have negatively impacted their deliberations.

After her counsel addressed the court, Ms. T. said, "I apologize. I am just frustrated that they don't know what happened." Later, at her sentencing, Ms. T. apologized for her behavior during her criminal trial, acknowledging that it "was a little uncalled for."

On appeal, Ms. T. asserts a single assignment of error. She argues that the circuit court erred in denying her motion for a mistrial "and motion for an evaluation of competency to stand trial" because her behavior presented apparent reasonable cause that she was not competent to stand trial. In her assignment of error, Ms. T. particularly draws attention to her "tasing by a bailiff . . . that occurred within the hearing of the jurors." The matter before us, concerning Ms. T.'s request that the circuit court "declare a mistrial, discharge the jury, and order a new trial in a criminal case[,] is a matter within the sound discretion of the trial court." Syl. Pt. 8, in relevant part, *State v. Davis*, 182 W. Va. 482, 388 S.E.2d 508 (1989).

Before we address the substance of Ms. T.'s arguments, two details demand attention, inasmuch as they are focal points of the assignment of error that Ms. T. presents to this Court. First, Ms. T. avers that the circuit court erred in failing to grant her "motion" for a competency examination. In fact, Ms. T. made no such motion, and it is inaccurate to charge the circuit court with the denial of a motion that was not made. Second, Ms. T.'s argument rests heavily on the fact of her counsel's report to the circuit court of an event occurring outside of the court's presence, in which a court bailiff is said to have used a Taser to subdue Ms. T. The appendix record on appeal, however, lacks a meaningful proffer of detail concerning that event, and the conclusory report of its occurrence is therefore not appropriate for our consideration. This clarification made, we proceed to address Ms. T.'s argument that the circuit court should have granted her motion for a mistrial, in the context of her assertion that her incompetence was apparent.

Though Ms. T. did not specifically request that the circuit court evaluate her mental capacity during her trial, she argues that the circuit court had an obligation to sua sponte order a competency examination under West Virginia Code § 27-6A-2(a), which provides:

Whenever a court of record has reasonable cause to believe that a defendant in which an indictment has been returned, or a warrant or summons issued, may be incompetent to stand trial it shall, sua sponte or upon motion filed by the state or by or on behalf of the defendant, at any stage of the proceedings order a forensic

3

evaluation of the defendant's competency to stand trial to be conducted by one or more qualified forensic psychiatrists, or one or more qualified forensic psychologists. If a court of record or other judicial officer orders both a competency evaluation and a criminal responsibility or diminished capacity evaluation, the competency evaluation shall be performed first, and if a qualified forensic evaluator is of the opinion that a defendant is not competent to stand trial, no criminal responsibility or diminished capacity evaluation may be conducted without further order of the court. The initial forensic evaluation may not be conducted at a state inpatient mental health facility unless the defendant resides there.

This statute, employing the word "shall," obligates the circuit court to order a competency evaluation upon the court's "reasonable cause to believe" that a criminal defendant lacks the capacity to stand trial. We do not believe, however, that the cold record we have reviewed evinces obvious signals that Ms. T.'s mental status was problematic. And because the trial judge was in the better position to "observe[] the demeanor of [Ms. T.] and other nuances of a trial that a record simply cannot convey" (*see Gum v. Dudley*, 202 W. Va. 477, 484, 505 S.E.2d 391, 398 (1997), there is no basis for finding that the circuit court had reasonable cause to believe that Ms. T. was not fit to continue at trial, or that the circuit court abused its discretion in denying Ms. T.'s motion for a mistrial.

A reasonable cause to question a criminal defendant's competency would arise if a court had a basis to believe that the defendant "is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him." Syl. Pt. 3, in part, *State v. Chapman*, 210 W. Va. 292, 557 S.E.2d 346 (2001) (citation omitted). But as the circuit court noted, Ms. T. displayed remarkable understanding of the process. Her interjections over witness testimony were salient to the subject at hand. For example, when the assistant prosecuting attorney asked the testifying pediatrician about the child's positive amphetamine test, Ms. T. called out, "What were the levels on that?" When the investigating officer testified that she was "excited" when her child fell ill, she exclaimed, "Excited? I am sorry, that's uncalled for. My kid was fed dope, and excited?" She used her outbursts to dispute witness testimony. Significantly, when other witnesses testified about the length of time her child was hospitalized, she corrected their testimony. Moreover, though she interacted in this manner with other witnesses, she reserved instructive commentary ("let's get this over with" and "just shut the f—k up" and "sit the f—k down") for her own attorney, the single person at the trial over whom she could exercise authority. The circuit court had every reason to believe that Ms. T. lacked the appropriate regard for propriety. It is not a foregone conclusion, however, that a reasonable person would question Ms. T.'s faculties.

Because Ms. T.'s trial interaction was rationally thought if not rationally presented, we find this case unlike *State v. Sanders*, 209 W. Va. 367, 549 S.E.2d 40 (2001), a case that Ms. T. argues should compel us to reach a different conclusion. Mr. Sanders, the criminal defendant in that case, suffered psychosis for more than a decade preceding his trial, and his counsel alerted the trial court to the defendant's past issues. This Court explained that in light of that well-documented history, including a prior expert opinion that Mr. Sanders' mental condition was expected to deteriorate

4

over time, Mr. Sanders' "bizarre behavior at trial" warranted further inquiry by the circuit court for the protection of the defendant's constitutional rights.[1] *Id*. at 376, 549 S.E.2d at 49.

And therein lie significant differences. First, Ms. T. had no known history that should have raised the hackles of the circuit court. In fact, though a foundational point of Ms. T.'s argument is that "addiction is a disease that affects both the brain and behavior," there is an absence of evidence linking addiction specific to her. Second, the apex of Mr. Sanders' extreme behavior at trial was a rambling, incoherent monologue made in the presence of the jury. Ms. T.'s, on the other hand, was the expletive-laced direction, delivered at the appropriate time, that her attorney conclude his closing argument, coupled with the extraordinary declaration, "He's my lawyer and I'm asking him to stop and sit down. He should, he's my lawyer." In consideration of what circumstances could alert a circuit court that its criminal defendant may lack the mental acuity to continue at trial, there is no equality in these scenarios. We find that the circuit court had no reason to view Ms. T.'s conduct and anything other than "[m]isconduct or disruptive behavior on the part of a defendant during the course of a criminal trial [that would] not establish grounds for [her] obtaining a mistrial." Syl. Pt. 3, *State v. Linkous*, 177 W. Va. 621, 355 S.E.2d 410 (1987).

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** December 7, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[1] Upon reviewing the trial record, this Court deemed Mr. Sanders' behavior "irrational and self-defeating." Mr. Sanders insisted on appearing at trial wearing his orange, prison-issued jumpsuit. He refused to allow his attorneys to introduce evidence concerning his criminal responsibility, and he barred one attorney from participating in his defense. More telling, however, the record reflects that the deputy who transported Mr. Sanders to trial described him as "rambling" about his perceived pre-judgment by the circuit court. After Mr. Sanders insisted on testifying (against the advice of his attorneys, after he refused to tell the attorneys what he planned to say) he refused to answer most questions. When he did respond to the questions asked, this Court found that he "engage[d] in a lengthy and largely incoherent monologue. . . ." *Sanders*, 209 W. Va. at 375, 549 S.E.2d at 48.