584 S.E.2d 169

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Gary Wayne KENT, Defendant Below, Appellant**

**No. 30649.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 2003.

Decided May 23, 2003.

Dissenting Opinion of Justice Maynard July 3, 2003.

**536**

Darrell V. McGraw, Jr., Attorney General, Heather D. Foster, Assistant Attorney General, Charleston, for Appellee.

Kristine A. Burdette, Esq., Frances C. Whiteman, Esq., Whiteman, Burdette & Radman, Fairmont, for Appellant.

PER CURIAM.

The appellant Gary Wayne Kent appeals his first degree murder conviction and subsequent life-without-mercy sentence. Following his conviction, the appellant filed a motion for a new trial asserting, *inter alia*, that he lacked the competency to stand trial. We find that the circuit court erred in not granting the appellant's motion. Therefore, we overturn the appellant's conviction.[1]

I.

On July 26, 1998, Gary Wayne Kent allegedly shot and killed Thomas Lee Allen. On July 27, 1998, a Marion County magistrate issued a warrant for the appellant's arrest; local law enforcement officials arrested the appellant without incident and placed him in the Marion County Correctional Center.

On July 29, 1998, appellant's counsel filed a motion to have the appellant psychologically and psychiatrically examined. The circuit court granted the motion and the appellant was taken from the Marion County Correctional Center to William R. Sharpe, Jr. Hospital (hereinafter "Sharpe Hospital" or "Sharpe").

When the appellant first arrived at Sharpe Hospital, he was diagnosed as suffering from "serious depression, suicidal ideation, severe mood swings, anhedonia," and "an inappropriate desire to be punished secondary to depression."

On September 29, 1998, forensic psychiatrist Dr. John D. Justice and a team of mental health care providers evaluated the appellant for his competency to stand trial. During the evaluation, Dr. Justice observed that the appellant had racing thoughts with an inability to focus and that the appellant reported hearing voices. Dr. Justice also

---

**1.** Because we are overturning the appellant's conviction for a lack of competency, we need not reach the appellant's other asserted appeals.

found that the appellant had "persecutory paranoid beliefs," difficulty concentrating, and memory difficulties; he also found that the appellant lacked the "motivation presently to help himself in the legal process." The appellant was also evaluated for malingering and by all indications was found not to be faking the symptoms of his mental illness, although the appellant does not consider himself mentally ill.[2]

The appellant has a well-documented history of mental illness. The appellant was well-known in his community for his incendiary letters to the local papers, pontificating on the "problems of black employment in the Fairmont community." The appellant also had a grandiose scheme of owning property that left him $15,000.00 in debt to local rental agencies. The appellant's bipolar disorder further led him to feel entitled to these real estate properties without having to pay for them.

In 1993, the appellant took employees of a local hotel hostage because he believed the hotel persecuted African–Americans in particular and the appellant specifically. The appellant believed that the employees of the hotel were conspiring to force him out of his job and into bankruptcy.

After being taken into police custody in 1993, a psychiatrist, who examined the appellant, diagnosed him as having a "very severe bipolar illness with symptoms of manic grandiosity isolating with depression." In 1993, a psychologist also diagnosed the appellant as having a bipolar disorder with delusional and paranoid symptoms; the psychologist stated that the appellant had previously suffered from periods of "manic grandiosity" alternating with "a history of major depression." The appellant also has "a history of persecutory paranoid beliefs."

According to the psychiatrist who evaluated the appellant in 1993, the appellant suffered from a disorder that was "manifested by unstable pathological states." The same psychiatrist also stated that "[e]uphoria, grandiosity, [and] impulsive generosity can

change into hopelessness, anergia, and black suicidality."

In his October 5, 1998 report to the circuit court, Dr. Justice diagnosed the appellant as having a history of "bipolar affective disorder, mixed state as well as a delusion disorder, paranoid type." Dr. Justice stated that the appellant was not currently competent to stand trial in his untreated medical condition. Dr. Justice recommended that the appellant needed two to six months of in-house treatment in Sharpe's forensic program for competency restoration. In the competency program, the appellant would receive counseling, psychotropic medications, including mood stabilizers and possibly anti-psychotics, and education about the legal process.

On October 16, 1998, the circuit court found the appellant was not competent to stand trial at the time and ordered that the appellant remain at Sharpe Hospital to receive the treatments recommended by Dr. Justice. The appellant remained at Sharpe and began to receive the recommended treatments.

On February 19, 1999, the appellant's treatment team at Sharpe reported to the circuit court that the appellant was competent to stand trial. In their report, the competency team recommended that the appellant *continue on his current medication regime* and that local mental health care providers continue to monitor and counsel the appellant after he returned to the Marion County Correctional Center.

On March 30, 1999, the Marion County Prosecutor's Office moved to have the appellant evaluated by Dr. Thomas Adamski, a forensic psychiatrist, and by Dr. William Fremouw, a forensic psychologist. The circuit court granted the prosecutor's motion.

On April 4, 1999, Dr. Adamski interviewed the appellant for two hours. Dr. Adamski found that the appellant was competent to stand trial. Further, Dr. Adamski opined that the appellant did not suffer from any "symptoms suggestive of psychosis or manic depressive illness." Dr. William Fremouw, a

---

**2.** This Court is aware that individuals who have a significant affective disorder or thought disorder often believe that they do not have a disorder and believe that they do not need to take their prescribed medications.

forensic psychologist, also evaluated the appellant and found him competent to stand trial. Dr. Fremouw, however, could not make a conclusive diagnosis of whether the appellant had a mental illness because, in his opinion, the medications prescribed for the appellant mostly likely controlled the symptoms of any disorder that the appellant might have.

On June 23, 1999, the appellant was released from Sharpe Hospital and returned to the Marion County Correctional Center.

On September 27, 1999, the appellant's jury trial began in circuit court. During the trial, the appellant rarely spoke with his counsel.[3] According to appellant's counsel, the appellant refused to take an active role in his own defense. His counsel advised him to look at the jury; the appellant refused. When his counsel asked the appellant questions related to his defense, the appellant did not answer or would answer questions in a seemingly nonsensical manner.

On October 1, 1999, the jury found the appellant guilty of murder. Because of the appellant's depressed manner and withdrawn state, appellant's counsel requested that Dr. Justice meet with the appellant. Dr. Justice visited the appellant in jail and found that the appellant was depressed, had suicidal thoughts, was subject to crying spells, and suffered from insomnia. On October 3, 1999, Dr. Justice saw the appellant again and found the appellant to be "very talkative" and "very angry" with an expansive affect. Suspecting that the appellant's bipolar symptoms were "breaking through," Dr. Justice prescribed a sedative to calm the appellant's racing thoughts and other "break through" symptoms.

On October 4, 1999, appellant's counsel filed a motion to have the appellant reexamined for his competency to stand trial. On October 4, 1999, the circuit court ordered the appellant taken back to Sharpe Hospital. On October 6, 1999, Dr. Justice discovered that the appellant had not been receiving his prescribed medications.[4] That same day, the circuit court ordered a retrospective evaluation to determine the appellant's competency at trial.

On December 3, 1999, appellant's counsel filed additional post-trial motions. The pleadings included a motion for a new trial because the appellant "was not competent to stand trial."

On January 7, 2000, the circuit court held a hearing to address the appellant's post-trial motions, including the issue of the appellant's competency. Also at the January 7, 2000 hearing, the appellant filed additional motions for acquittal or a new trial.

At the hearing, the chief jail administrator of the Marion County Correctional Center testified that after returning to the Marion County Correctional Center from Sharpe Hospital to stand trial, the appellant refused to go to a local mental health care provider so that his prescriptions could be refilled. Despite the appellant's having spent eight months in Sharpe Hospital for treatment with the goal of being restored to competency, the Marion County Correctional Center Authority failed to contact the circuit court, the prosecutor's office, or appellant's counsel about the appellant's lack of medication. According to jail records, the appellant last received his prescribed medicine on August 5, 1999, over a month before his jury trial. At the January 2000 hearing, the circuit court took judicial notice of the correctional center's obligation to provide prescribed medical care including medication.

Also at the January 7, 2000 hearing, Dr. Justice reported to the circuit court that

---

**3.** During the trial, the appellant wrote several notes on the legal pad provided to him by his counsel. On the first day of trial, the appellant wrote "Have nice day." On the second day of trial, the appellant put brackets around what he had written on the first day of trial "[Have a nice day]." On the third day of trial, the appellant wrote under "[Have a nice day]":

First Day—State—Mad
Second Day—State—Mad

Third Day—State—Still Mad.
On the the fourth day of trial, the appellant added:

Fourth day—Defense—Don't Know
Fifth day
Sixth day

**4.** A blood test later confirmed that the appellant's blood was free of the medications that he had been prescribed at Sharpe Hospital.

during the trial, the appellant had experienced many of the same symptoms that he had manifested before being taken to Sharpe. According to Dr. Justice, the appellant was depressed, had difficulty blocking out sounds, his mind was racing, had difficulty focusing, and the trial proceedings occurred too quickly for the appellant to understand. Dr. Justice also found that the appellant was afraid of his attorneys and that he had given up on his defense. Dr. Justice further found that the appellant believed people in the courtroom could read his mind, and that the appellant believed he could read the minds of others.

Dr. Justice testified that the appellant had suffered a "relapse of his symptoms of bipolar affective disorder as a result of [his pre-trial] unmedicated state." Because of his untreated medical state, Dr. Justice opined that the appellant was not able to appreciate the charges against him and that "his capacity to disclose to his attorneys, testify in his defense and testify relevantly" were severely limited; that the appellant was most likely unable to effectively communicate with defense counsel; and that there was high degree of uncertainty regarding the appellant's competency to stand trial.

In contrast, Dr. Adamski, who evaluated the appellant for two and one-half hours on October 31, 1999, *approximately twenty-three days after the appellant had resumed his medications*, testified that the appellant was competent at trial and had simply chosen not to communicate with his counsel. Although he had reviewed the appellant's prior medical records and the documents amassed during the appellant's lengthy stay at Sharpe Hospital, Dr. Adamski further testified that he could "find no records indicating that this individual is, or has ever been, psychiatrically dysfunctional."

At the conclusion on the hearing on January 7, 2000, the circuit court found that the appellant was competent to stand trial, and the circuit court sentenced the appellant to life in prison without the possibility of parole. On August 7, 2001, the circuit court denied all of the appellant's outstanding post-trial motions and confirmed the appellant's sentence to life in the penitentiary without the possibility of parole.

The appellant appeals his conviction and subsequent sentencing.

### I.

Criminal defendants have the right to be competent to stand trial and to meaningfully participate in their defense. "It is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent. *State v. Cheshire*, 170 W.Va. 217, 219, 292 S.E.2d 628, 630 (1982)." Syllabus Point 5, *State v. Hatfield*, 186 W.Va. 507, 413 S.E.2d 162 (1991). "No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him." Syllabus Point 1, *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976). In *Milam*, the Court held that although an accused person may have been sane at the time he committed the offense, he can not be subjected to a trial unless he is mentally competent.

The United States Supreme Court has further recognized that "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the right to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so." *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498, 506 (1996). In *Cooper*, the United States Supreme Court held that an Oklahoma law presuming that a criminal defendant is competent to stand trial unless the defendant can prove his lack of competence by clear and convincing evidence violated the defendant's due process rights.

This Court has recognized the use of a two-pronged standard to determine whether an individual is competent to stand trial. "To be competent to stand trial, a defendant must exhibit a sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding and a rational, as well as factual, understanding of the proceedings against him." Syllabus Point 2, *State v. Arnold,* 159 W.Va. 158, 219 S.E.2d 922 (1975) *overruled on other grounds by State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649 (1980).

At issue is whether the circuit court erred in failing to grant the appellant a new trial because the appellant lacked competence to participate in his own defense.

■ After being arrested for murder in the instant case, the circuit court initially found the appellant incompetent to stand trial and ordered the appellant receive treatment at Sharpe Hospital. The appellant remained at Sharpe Hospital for almost nine months where he was diagnosed, treated, and apparently restored to competency.[5]

Based on Dr. Justice's conclusions, the appellant, in his untreated medical condition, had difficulty blocking out sounds, had racing thoughts, and had difficulty focusing. The appellant's perception of events was skewed by his paranoid, persecutory thinking. During trial, the appellant was afraid of his attorneys and believed that people in the courtroom could read his mind, and that he, in turn, could read the minds of others. In his untreated medical state, the appellant was not able to appreciate the charges against him and his ability to meaningfully participate in the trial process and communicate with his counsel were severely limited.

Without his medications and counseling, the appellant regressed and relapsed into the state in which the circuit court had initially found him incompetent to stand trial.[6] Having reviewed the record, we find that the appellant did not "exhibit a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." We further find that the appellant

lacked the "rational, as well as factual, understanding of the proceedings against him." Accordingly, we find that the appellant lacked the mental capacity to meaningfully participate in his defense.

## III.

Because the appellant lacked the competence to stand trial, the circuit court erred in not granting the appellant's motion for a new trial. Therefore, we reverse and remand for further proceedings.

Reversed and Remanded.

Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

MAYNARD, Justice, dissenting.

(Filed July 3, 2003)

I would have affirmed the defendant's first-degree murder conviction and subsequent life-without-mercy sentence because I do not believe that the trial judge abused his discretion in denying the defendant a new trial on competency grounds.

This Court has explained:

Because a trial court is able to observe the demeanor of the defendant and consequently has a better vantage point than this Court to make determinations regarding mental competency, we will disturb a lower court's ruling denying a psychiatric examination and related proceedings only where there has been an abuse of discretion.

*State v. Sanders,* 209 W.Va. 367, 379, 549 S.E.2d 40, 52 (2001) (citation omitted). In his order denying the defendant's motion for a new trial, the trial judge found:

During the trial, the Court observed that the defendant's demeanor was normal and he exhibited no unusual behavior. The

---

5. The appellant was released to return to the Marion County Correctional Center with the instructions that he continue taking his medications, and that he receive monitoring and counseling by local mental health care providers. If these instructions had been followed, this matter probably would not be before this Court today. The appellant's relapse of symptoms would have been discovered long before his trial.

6. Nothing in the record suggests why the symptoms which initially made the appellant incompetent to stand trial would not again render him incompetent to stand trial having resurfaced when the appellant stopped receiving his prescribed medicine.

Court also observed no evidence of irrational behavior or any other indications whatsoever that the defendant was incompetent to stand trial. Further, the Court personally observed the defendant communicate with defense counsel on several occasions and he appeared to have a rational understanding of the proceedings against him. Throughout the course of the trial the Court was convinced that the defendant was competent to stand trial and no evidence or suggestions to the contrary were presented until *after* the defendant was convicted. In considering the circumstances retrospectively, the Court is still convinced that the defendant was competent to stand trial throughout the duration of his trial.

Further, said the trial judge,

During the trial, the defendant's demeanor was not unusual or extraordinary and the Court observed no evidence of irrational behavior or any other indications whatsoever that the defendant was incompetent to stand trial. In fact, the Court personally observed the defendant communicate with defense counsel on several occasions and he appeared to have a rational understanding of the proceedings against him.

Apparently the Court was not alone in its belief that the defendant was competent to stand trial because no one, particularly defense counsel, informed the Court of any suspicions or conclusions that the defendant may be incompetent until *after* the defendant was convicted.... [I]t seems peculiar that, if the defendant was exhibiting signs of incompetency during the trial, defense counsel never noticed his incompetency until *after* the defendant had been convicted of first degree murder and received no recommendation of mercy. The Court is of the opinion that it would be a miscarriage of justice to grant the defendant a new trial on the basis that he was incompetent to stand trial during the trial when the defendant failed to inform defense counsel that he was not being provided his medication at the jail and when defense counsel waited until *after* the verdict is returned to inform the Court of their suspicions that the defendant was incompetent to stand trial.

The majority opinion contains a great deal of information about the defendant's mental health history. However, the trial judge had access to all of the defendant's previous psychiatric evaluations when he made his decision. Also, the majority opinion asserts that "[d]uring the trial, the appellant rarely spoke with his counsel[,]" Slip op. at 5, which is directly at odds with the trial judge's finding that "the Court personally observed the defendant communicate with defense counsel on several occasions[.]" Since the trial judge was actually at the defendant's trial, and the members of this Court were not, I will take the trial judge's word for it. Finally, the majority apparently accepts defense counsel's claims that the defendant behaved irrationally at trial. Defense counsel's word, however, quite frankly is incredible due to the fact that he never mentioned the defendant's irrational behavior until *after* the jury verdict.

The Supreme Court has established that a State may presume that the defendant is competent to stand trial and require him to prove his incompetence by a preponderance of the evidence. *Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). *See also Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). The trial judge expressly found "that the defendant has failed to prove that, at the time of his trial, he was 'more likely than not' incompetent to stand trial." The trial judge's findings are supported by Dr. Adamski's determination both pre- and posttrial that the defendant was competent to stand trial; the trial judge's own observations of the defendant during the trial; and the fact that defense counsel never alerted the trial judge during the trial of any suspicions that his client was incompetent. In light of this evidence, I fail to understand how the majority can find that the trial judge abused his discretion. Accordingly, I dissent.